26 Cal.Rptr.3d 394 (2005)
127 Cal.App.4th 1109
In re JASMINE G., a Person Coming Under the Juvenile Court Law.
Orange County Social Services Agency, Plaintiff and Respondent,
v.
Lisa G., Defendant and Appellant.
No. G033900.
Court of Appeal, Fourth District, Division Three.
March 28, 2005.
*395 Lori A. Fields, Los Angeles, under appointment by the Court of Appeal, for Defendant and Appellant.
Benjamin P. de Mayo, County Counsel, and Lori D. Barcelona, Deputy County Counsel, for Plaintiff and Respondent.
No appearance for Minor.

OPINION
BEDSWORTH, Acting P.J.
Lisa G. appeals from an order that terminated parental rights to her daughter, Jasmine G., pursuant to Welfare and Institutions Code section 366.26.[1] She argues the Orange County Social Services Agency (SSA) failed to give her adequate notice of the selection and implementation *396 hearing, and the evidence does not support a finding of sufficient notice under Indian Child Welfare Act (ICWA) (25 U.S.C. § 1912(a).) We agree on the first point, and so reverse.
In March 2003, Jasmine was born with methamphetamine in her system. She was taken into protective custody shortly thereafter. SSA filed a dependency petition alleging Lisa had a history of substance abuse that impaired her ability to care for the child. (§ 300, subd. (b).) Lisa appeared at the detention hearing and the juvenile court ordered Jasmine detained.
The jurisdiction/disposition hearing was scheduled for May 2003. Lisa attended. SSA reported possible Indian ancestry. Lisa told a social worker she had checked with her mother and "there was no American Indian ancestry in our family." But the social worker's call to the mother revealed ambiguity: "I remember someone talking about Indian ancestry in our family and I don't want to say `no' then `yes' later." Lisa's mother did some checking and called back to say Lisa's grandmother believed "the family ha[d] Blackfeet and Cherokee background." The juvenile court continued the hearing and ordered SSA to notify the named tribes and the Bureau of Indian Affairs (BIA).
The hearing was held in June 2003. Lisa appeared and pleaded no contest, and the juvenile court sustained the petition. SSA filed the notices it had sent to the Blackfeet, three Cherokee tribes, and the BIA, along with proofs of service and certified-mail return receipts for each. One Cherokee tribe responded that Jasmine was not one of its members. The court ordered SSA to renotice the remaining tribes. It declared Jasmine a dependent child, ordered reunification services, and ordered Lisa to return for a six-month review.
Lisa appeared for the six-month review on November 18, 2003. Despite her appearance, SSA filed a search declaration dated November 13, 2003. In it, a social worker recited various addresses to which she had sent notice of the hearing. The social worker also said she had spoken with Lisa the previous day, told her of the hearing, and Lisa provided a new, current address on Morgan Lane, Garden Grove. For reasons that do not appear in the record, the matter was continued.
The hearing was held on December 17, 2003. This time, Lisa did not show up. SSA filed an addendum report, signed on December 10, 2003, that said Lisa's address and telephone were "unknown." A status review report stated Lisa had been discharged from an inpatient drug program for using drugs and had failed to make any progress with her case plan. Lisa had been visiting Jasmine regularly through June, with positive interaction. After that, visitation was sporadic. SSA submitted the second round of notices it had mailed to the remaining Indian tribes and the BIA, along with certified mail return receipts and said no one had responded. The juvenile court terminated reunification services, ordered that a selection and implementation hearing be held, and ordered SSA to attempt to notify Lisa. It found the ICWA inapplicable.
On March 1, 2004, the juvenile court held a notice review hearing. SSA re-filed its prior November 13, 2003 search declaration, and nothing else. That is, it offered no evidence of any attempt to locate Lisa after that date. Lisa's trial attorney stipulated to SSA's due diligence, and on this basis the court found SSA had exercised due diligence in its efforts to locate Lisa. It authorized notice by service on her attorney.
The selection and implementation hearing was held on April 14, 2004. SSA's report for this hearingsigned on April 1, *397 2004 and filed on April 13, 2004reported that a social worker had spoken with Lisa eight times after the setting order, and met with her once. That meeting took place on January 27, 2004, and the last telephone contact was on February 24, 2004.[2] During all of these contacts, no one told Lisa of the upcoming hearing. The report also set forth a new address for Lisa on West Orangethorpe Avenue in Placentia, but did not indicate when it had been obtained. Nothing in the record indicates SSA even tried to notify Lisa at the new address, nor that it advised her trial attorney of that address.[3]
The juvenile court denied a request by Lisa's trial attorney for a continuance to allow him to locate and notify her. SSA reported inconsistent visitation and recommended termination of parental rights. Lisa's trial attorney did not cross-examine, offer evidence, or argue. The juvenile court found Lisa "received notice as required by law," and ordered parental rights terminated and the child placed for adoption.

I
Lisa argues she was denied due process because her parental rights were terminated without notice of the selection and implementation hearing. She is right.
Notice is both a constitutional and statutory imperative. In juvenile dependency proceedings, due process requires parents be given notice that is reasonably calculated to advise them an action is pending and afford them an opportunity to defend. (See, e.g., In re DeJohn B. (2000) 84 Cal.App.4th 100, 106, 100 Cal.Rptr.2d 649.)
Furthermore, notice of a selection and implementation hearing is mandated by statute. SSA is required to give notice of a selection and implementation hearing to the child's parents (among others) by section 294, subdivision (a)(1). When a parent is not present at the setting hearing, notice must be given by one of following means: certified mail, return receipt requested at the last known address, established by a signed receipt; personal service; substituted service at the parent's usual place of residence or business, with a second copy sent to that address by first class mail; or, in certain cases not applicable here, by first class mail. (§ 294, subd. (f)(2)-(6).)
If SSA is unable to serve a parent in this manner, it must file a declaration showing the efforts it has made. (§ 294, subd. (f)(7).) The juvenile court may then permit service on a parent's attorney of record by certified mail, return receipt requested, if it finds SSA exercised "due diligence in attempting to locate and serve the parent" and the case is one where adoption is recommended. (§ 294, subd. (f)(7)(A).) However, "[i]n any case where the residence of the parent becomes known, notice shall immediately be served upon the parent" by one of the means set out above. (§ 294, subd. (f)(7)(C).)
Failure to comply with the statute in this case resulted in a mistake of constitutional dimension. Arizona v. Fulminante (1991) 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302, a criminal case, explained that all constitutional errors are not equal. Trial errorsthose which occur *398 during presentation of the case to the trier of factmay be evaluated to see if the error was harmless beyond a reasonable doubt. (Id. at pp. 307-308, 111 S.Ct. 1246.) Structural errors are different and demand automatic reversal. "These are structural defects in the constitution of the trial mechanism, which defy analysis by `harmless-error' standards." (Id. at p. 309, 111 S.Ct. 1246.) Structural defects are those "affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself. `Without these basic protections, a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair.' [Citation.]" (Id. at p. 310, 111 S.Ct. 1246.)
California courts have applied Fulminante outside the criminal context, including notice failings in juvenile dependency proceedings. Some have found structural error. (Judith P. v. Superior Court (2002) 102 Cal.App.4th 535, 126 Cal.Rptr.2d 14 [failure to file a status report 10 days before review hearing as required by statute, with result that parent was denied timely notice of charges and witnesses, and adequate opportunity to prepare].) Others have concluded there was only trial error. (In re Daniel S. (2004) 115 Cal.App.4th 903, 9 Cal.Rptr.3d 646 [attempt to notify mother of jurisdiction/disposition hearing but not temporary conservator appointed when mother was placed in mental hospital]; In re Angela C. (2002) 99 Cal.App.4th 389, 120 Cal.Rptr.2d 922 [failure to give parent notice of continued selection and implementation hearing when she did not appear on originally noticed date].)
Our decision in In re DeJohn B, supra, 84 Cal.App.4th 100, 100 Cal.Rptr.2d 649 implied there was structural error where SSA never tried to notify a parent of a six-month review hearing. The result in that case was that reunification services were terminated and a selection and implementation hearing set. We held the lack of notice violated due process, the error was not harmless, and it required reversal of a later order terminating parental rights. As we explained: "Where, as here, the agency has not even attempted to advise a parent of proceedings that affect her fundamental rights as a parent, we will not accept an argument that SSA's failure to give notice was harmless. We reject the contention that we can ignore the lack of notice because the parent was unworthy and, thus, was not prejudiced by lack of notice." (Id. at p. 102, 100 Cal.Rptr.2d 649.) Later, we said: "Where SSA fails even to make an effort to provide mother the procedural safeguard of notice, reversal is mandated." (Id. at p. 110, 100 Cal.Rptr.2d 649.)
We now make explicit what is implicit in DeJohn Bthe failure to attempt to give a parent statutorily required notice of a selection and implementation hearing is a structural defect that requires automatic reversal. It denies a parent the opportunity to confer with her attorney, prepare her case, or defend against the loss of parental rights. Without this, we cannot say the loss of parental rightsor the hearingis fundamentally fair. The absence of any reasonable attempt to give notice goes well beyond trial error. It is not merely a mistake that hinders a party's ability to present the case effectively, but rather a flaw in the systemic framework that denies that party the opportunity to be heard at all. It goes to the basic fairness of the structural scheme. Since this was structural error, we do not consider whether it was also harmless.
SSA's position in this case is very troubling, as it was in DeJohn B. It concedes only that "the record lacks evidence of attempts to personally serve Lisa." But *399 that is not the full of it. In fact, SSA made no attempt, absolutely none, to even look for Lisa after the six-month review. It simply resubmitted the November 2003 search declaration to show compliance with the later December 2003 order to serve notice of the upcoming hearing. Particularly astonishing is the apparent failure of anyone to even read that declarationwhich gave Lisa's then current telephone number and address (previously unknown to SSA) and identified a friend at one of the known addresses who had delivered prior notices to Lisa.
We are unable to imagine an explanation for failing to tell Lisa about the hearing during eight telephone contacts and one meeting following the setting order. This is such an uncharacteristic failure that we must wonder if something was going on that does not appear in our record. But no one has been able to explain what that was, so we are left wondering, "What were they thinking?" It is equally inexplicable for SSA to have ignored the West Orangethorpe Avenue address listed as Lisa's current residence in its own report for the selection and implementation hearing.
SSA's arguments in deference of notice in this case are unconvincing. It contends Lisa waived the notice issue when her trial lawyer stipulated to due diligence, failed to file a writ petition or an appeal from the due diligence order, or object at the selection and implementation hearing. We disagree completely.
When Lisa's trial lawyer stipulated to due diligence, he was entitled to rely on SSA's representation that it did not know her whereabouts. In essence, he took its word for the proposition that his client was unlocatable even with all the resources of the government brought to bear. Under such circumstances, SSA can hardly be heard to assert there was a knowing waiver of the notice issue.
By resubmitting the November 2003 search declaration, SSA represented it had no more recent information about Lisa's whereabouts. But that was not true. As later revealed in SSA's report for the selection and implementation hearing, a social worker spoke with Lisa by telephone on December 24, 2003, January 14, 20, and 21, 2004, February 4, 10, 11, and 24, 2004, and the social worker met with Lisa on January 27, 2004. Since trial counsel stipulated to due diligence based on misinformation from SSA, and presumably refrained from challenging the due diligence order for the same reason, we cannot accept the argument there was a waiver of the notice issue.[4]
SSA argues any failure of notice was harmless based on two recent decisions. Both are distinguishable. In In re Daniel S., supra, 115 Cal.App.4th 903, 9 Cal.Rptr.3d 646, a social worker tried to notify a parent, detained in a mental hospital, but not her temporary conservator. The court found this was harmless error without considering whether it was a structural error. Here, there was no attempt to give notice, and we believe that makes all the difference.
The other case SSA cites is In re Angela C., supra, 99 Cal.App.4th 389, 120 Cal. *400 Rptr.2d 922. There, a parent had been given proper notice of a selection and implementation hearing but did not appear, and the social services agency failed to give notice of the continued date. The court held this was trial error, and harmless. It said the parent had received notice of the originally scheduled hearing, and the juvenile court could have proceeded without her at that time. Again, we find the failure here qualitatively different. In this case, SSA never even tried to give Lisa notice of the selection and implementation hearing, despite having been in regular contact with her and having a current address. That is the difference between a sound structure which fails due to human error and an unsound structure which can never support a fair process. It is the difference between reversible error and error per se, and in this case it requires reversal.

II
Lisa does not fare as well on the ICWA argument. She asserts the juvenile court cannot properly find the act inapplicable until all tribes sent notice have responded. But that is not the law.
The ICWA provides that where termination of parental rights is sought and a state court has reason to know an Indian child is involved, it must require the party seeking termination to notify the Indian child's tribe of the pending proceedings and the right to intervene. (25 U.S.C. § 1912(a).) Once proper notice is given, "the lack of any response from BIA, and the absence of any communication sent to [the social services agency] by a tribe, were tantamount to determinations that the minor was not an `Indian child' within the meaning of the Act." (In re Levi U. (2000) 78 Cal.App.4th 191, 198, 92 Cal.Rptr.2d 648.)
Here, the relevant tribes and the BIA were given notice by SSA twice, and each time several of them failed to respond. That is sufficient to support the finding that the ICWA does not apply and Jasmine is not an Indian child within the meaning of the act.
Lisa argues a finding of notice is impermissible when a social services agency does not file responses from the tribes, citing In re Karla C. (2003) 113 Cal.App.4th 166, 175-176, 6 Cal.Rptr.3d 205. But the case does not go that far. It only holds the actual notices sent must be filed (along with the return receipts) so the juvenile court can determine if they complied with the ICWA. (Id. at p. 178, 6 Cal.Rptr.3d 205.) Lisa does not deny the notices were filed in this case, or challenge their content, so this argument is unavailing.
Since SSA made no attempt to notify Lisa of the selection and implementation hearing, the order terminating parental rights and directing the minor be placed for adoption is reversed. The case is remanded for a new selection and implementation hearing, to be held only after proper notice to Lisa.
WE CONCUR: MOORE and FYBEL, JJ.
NOTES
[1] All statutory references are to the Welfare and Institutions Code, unless otherwise indicated.
[2] SSA reported telephone contacts with Lisa on December 24, 2003, January 14, 20, 21, 2004, and February 4, 10, 11, and 24, 2004, and it said a social worker had met Lisa on January 27, 2004, during a visit with Jasmine.
[3] At oral argument, counsel for SSA said it had served the report on Lisa's trial counsel on April 6, 2004, but this does not appear in the record.
[4] The record also suggests SSA had a current address for Lisa by March 1, 2004, the date it refiled the November 2003 search declaration. That address, on West Orangethorpe Avenue, was first revealed in SSA's April 1, 2004 report for the selection and implementation hearing. The report does not say when it was obtained. At oral argument, counsel for SSA said she did not know when it first learned of the address. We believe a reasonable inference is that SSA had to have known the address no later that its last contact with Lisa on February 24, 2004nothing else in the report explains how the information might have been obtained.