53 Cal.Rptr.3d 120 (2007)
146 Cal.App.4th 599
In re JAMES F., a Person Coming Under the Juvenile Court Law.
Los Angeles County Department of Children and Family Services, Plaintiff and Respondent,
v.
Marcus M., Defendant and Appellant.
No. B188863.
Court of Appeal of California, Second District, Division Seven.
January 8, 2007.
*121 Ellen Forman Obstler, under appointment by the Court of Appeal, for Defendant and Appellant.
Raymond G. Fortner, Jr., County Counsel, Larry Cory, Assistant County Counsel, and Frank DaVanzo, Principal Deputy County Counsel, for Plaintiff and Respondent.
JOHNSON, J.
Marcus M. (father) appeals from the juvenile court's order terminating his parental rights to his then two-year-old son. He contends the juvenile court committed *122 reversible error when it (1) appointed a guardian ad litem without inquiring about his competence and explaining the purpose of the appointment and (2) failed to obtain a knowing waiver of father's right to be present at the hearing where the court terminated his parental rights. The Department of Children and Family Services (DCFS) concedes the juvenile court erred when it appointed a guardian ad litem without advising father of the consequences of the appointment, but argues the error was harmless beyond a reasonable doubt. DCFS also asserts father forfeited his right to be present at the hearing where his parental rights were terminated. We conclude the juvenile court's error in appointing a guardian ad litem without inquiring about father's competence and explaining the purpose of the appointment was a structural error requiring reversal of the order terminating father's parental rights.

FACTS AND PROCEEDINGS BELOW
On September 11, 2003, two-month-old James F. was detained from the home of his paternal grandparents, where he had been living in the custody of his parents. DCFS had received hotline referrals indicating James was being "emotionally abused" by father and "generally neglected" by his mother. Father, who appeared agitated and nervous when social workers came to the home, blocked the door and said he did not want James to be detained. The social workers asked law enforcement to assist them in the detention. According to DCFS, a sheriffs deputy who responded to the scene told the social workers deputies were "often called" to the home and considered it "a high threat due to drugs and father's combative nature." Apparently, father had "physically fought" with deputies in the past when they were called to the home. When the social workers returned to the home with several sheriffs deputies, James's mother "was cooperative and gave [James]" to a sergeant. James was placed in foster care.
On September 16, 2003, DCFS filed a section 300[1] petition, which only included allegations against James's mother.[2] At the detention hearing on the same date, although father was not yet a defendant, the juvenile court issued an order appointing an expert under Evidence Code section 730 to conduct psychological and neurological testing on father and to evaluate father's substance/alcohol abuse and its effect on James. The court also asked the expert to evaluate the causes of father's "left leg twitching" and the fact father "jolts [his] head side to side and perspires heavily," as observed by social workers. The juvenile court also ordered father to participate in random drug testing and parenting and granted him monitored visitation with James. The following day, the expert notified the court her office could not accept the appointment to conduct an evaluation of father.
On October 9, 2003, DCFS filed a first amended section 300 petition, which included several allegations against father. The petition alleged father had been diagnosed with bi-polar disorder, had been prescribed psychotropic medication and had "demonstrated numerous emotional and mental problems." The petition also alleged father had a history of "violent behavior," which included a conviction for assault with a firearm, and had a history of substance abuse.
*123 In its report for the October 9, 2003 jurisdiction/disposition hearing, DCFS detailed what it described as father's "extensive criminal history." DCFS also reported father had been admitted to Patton State Hospital because of his mental condition in November 1998 and November 2000, while he had criminal prosecutions pending. James's paternal grandfather told a social worker father had been diagnosed with bi-polar disorder and had been prescribed three medications for the condition. According to DCFS, the grandfather claimed father's emotional and mental problems began four years before "when he was physically assaulted by several members of the East Los Angeles Sheriffs [Department]." The grandfather also reported, when father was not taking his psychotropic medications, he would "`become[] very aggressive,'" and the grandfather feared father would hurt him. When a social worker attempted to interview father at the paternal grandfather's home, he witnessed behavior which caused him to believe father might "physically assault" the grandfather, but this did not happen. The grandfather also seemed to express concern for the social worker's safety based on father's behavior.
In the jurisdiction/disposition report, DCFS also described father's discussions with the social worker. Father said he wanted visits with James. He claimed he was trying to find an apartment and a job. DCFS reported father "readily admitted to not taking his prescribed psychotropic medication." The social worker stated father "didn't seem to understand the allegations contained in the juvenile dependency petition" and did not appear to "be able to focus on the subjects ... discussed." DCFS recommended the juvenile court order reunification services and monitored visitation for father.
At the hearing on October 9, 2003, father denied the allegations in the first amended petition. The juvenile court appointed another expert under Evidence Code section 730 to evaluate, among other things, father's mental condition, his substance/alcohol abuse and whether he was "capable of caring for an infant." The parties stipulated to continue the hearing so the court could receive the expert's report. On November 20, 2003, when the court still had not received the report, it "dissolved" the requirement for a 730 evaluation. DCFS explained it no longer needed the evaluation because it had subpoenaed father's records from Patton State Hospital and found there was "more than enough information" in those records "to explain the need for jurisdiction."
In an interim review report prepared for a December 1, 2003 hearing, DCFS reported it had reviewed father's "mental health records" from Patton State Hospital and those records indicated father "suffers from severe psychological problems, and his behavior has improved while prescribed a steady regimen of psychotropic medication." DCFS filed the records with the juvenile court.
On December 1, 2003, DCFS informed the court father had been arrested for robbery. The juvenile court continued the matter two times so father could be transported from jail to appear at the hearing.
On December 16, 2003, father appeared at the contested jurisdiction/disposition hearing. After the parties' attorneys stated their appearances, another woman addressed the court and stated she was "available for appointment as GAL [guardian ad litem] for the father." The juvenile court responded: "You will be appointed." The parties stated they would submit on the reports the court had received. The court explained it also had received a waiver of rights form signed by father which *124 father had reviewed with his attorney and the guardian ad litem. The court asked father if he understood the rights listed on the form and the consequences of entering a plea, and father said he understood. When the court asked father to confirm he was giving up those rights, father responded: "Yes. Yes. Why, no, I don't think that's right, Your Honor, because I want a trial, because I want to get my baby back." The juvenile court explained, if father entered a plea and the court assumed jurisdiction, the court would order DCFS "to provide services for [father] to try to help [father] get the child back." Father said he wanted that to happen. Father's counsel joined in the plea, concurred in the waivers and stipulated to a factual basis for jurisdiction.
The juvenile court accepted father's plea to the first amended petition, found the amended allegations to be true and declared James to be a dependent of the court. Thereafter, James's attorney stated: "Your Honor, I need to interrupt the court if I may. I'm concernedI certainly am in agreement with the ultimate decision of the courtbut I'm concerned for the record whether or not the record is sufficient to warrant an appointment of a GAL, particularly when a court is taking a waiver from this gentleman who is alleged to require a GAL. It is quite clear to me that he does not understand what is going on today, and I'm concerned about my client at some point in the future having his status in limbo due to an appeal."
In response to this concern, father's counsel engaged in the following exchange with father:
"[Father's counsel:] Do you need help today working on your case? Do you need to have two attorneys instead of one?
"[Father]: Yes.
"[Father's counsel]: Does it help you to have another attorney help you with your case?
"[Father]: I understand.
"[Father's counsel]: Does it help you to have another attorney help you with your case? Did you like having another attorney help you understand?
"[Father]: Yes. Yes."
James's counsel asserted: "Your Honor, that's not the inquiry. I would object." Thereafter, the following exchange took place between James's counsel and father:
"[James's counsel:] Do you know what you are here for today?
"[Father]: For my children, to get my son back.
"[James's counsel]: Do you know what [sic] today was set for a trial of the issues in this case that you are alleged, things that you have been alleged to have done?
"[Father]: Oh."
Both James's counsel and DCFS's counsel stated it appeared father was looking to his relatives in the courtroom to tell him what to say. The juvenile court decided to continue the matter to give father's attorney, his guardian ad litem and the paternal grandfather an opportunity "to confer and to discuss this proceeding further with the father." Father asked the court, "What is the GAL?" The court told father it was his "second lawyer." Father stated, "Well, I don't know what GAL here. [Sic.]" James's counsel suggested the juvenile court conduct an in camera hearing on the next court date "with regards to whether or not [father] even needs a GAL." The court responded: "I think I can fairly say that he's in a position or a condition where a GAL would be to his benefit, [¶] ... [¶] That finding I would make today." The juvenile court struck father's plea and set a date for an adjudication hearing.
*125 In an interim review report prepared for a January 26, 2004 hearing, DCFS reported James was placed in the home of his maternal grandparents on December 19, 2003. In a report prepared for the March 10, 2004 adjudication hearing, DCFS reported father was still incarcerated, but was going to be moved to Patton State Hospital. Based on this development, DCFS asserted father did not "appear[] anywhere near to being able to resume custody of James."
On March 10, 2004, father's guardian ad litem signed a waiver of rights form on his behalf. At the adjudication hearing the same day, the guardian ad litem stated she believed it was to father's benefit to waive his rights because DCFS was offering him reunification services. She did not believe father's "current functioning" allowed him to sign the waiver of rights form himself. The guardian ad litem confirmed she had read the rights to father and he understood them as well as the consequences of his plea. On father's behalf, she submitted on the petition. Father's counsel joined in the plea, concurred in the waivers and stipulated to a factual basis for jurisdiction. The juvenile court accepted father's plea, found the amended allegations to be true and declared James to be a dependent of the court. The court granted father monitored visitation and ordered him to participate in drug rehabilitation with random testing, an alcohol rehabilitation program with random testing or a 12-step program, parenting education and individual counseling. Father's counsel noted for the record father wanted James placed with the paternal grandparents. The court pointed out DCFS had "already examined them."
In a status review report prepared for a May 12, 2004 hearing, DCFS reported father was transported to "Patton Mental Health State Hospital" on March 23, 2004 after he "was deemed to be incompetent to stand trial" in his criminal case. DCFS asserted father was not complying with his case plan. He was terminated from the Alcoholics Anonymous program at Patton because of his "uncontrollable anxiousness." He was "participating in a behavior modification program to alleviate his anxiousness." He was not participating in drug testing or parenting because Patton did not offer those programs. A social worker at Patton told DCFS father suffered from "[s]chizoaffective disorder" and substance abuse, and had been prescribed anti-anxiety and psychotropic medications. This social worker also stated father was "not exhibiting any behavioral problems but [was] exhibiting obsessive/compulsive behavior." The paternal grandparents were acting as father's conservators. Father had not had any visits with James, but father's social worker at Patton reported father was "anxious to reunite" with James and wanted to "regain custody." DCFS recommended the juvenile court terminate father's reunification services.
Father appeared at the May 12, 2004 hearing. Father's guardian ad litem informed the juvenile court she would like to set the matter for a contest. Father's attorney said she planned to submit information to the court about father's participation in programs at Patton. James's attorney objected to the guardian ad litem's request to set the matter for a contest, asserting he did not believe there would be "sufficient evidence to overcome the father's mental problems." The court set the matter for a contest. Father briefly addressed the court and reiterated he wanted James to live with the paternal grandparents.
In a status review report prepared for a July 14, 2004 hearing, DCFS informed the juvenile court father was in partial compliance with his case plan. He had *126 been participating in Narcotics Anonymous and Alcoholics Anonymous programs for two months and, according to a social worker at Patton, had been attending these programs "`faithfully.'" DCFS "provided father with a folder with parenting literature" because Patton did not offer a parenting program. The paternal grandparents were in the process of completing the paperwork necessary to secure visits at Patton for James and father. Father reported he was doing well and "wanted to finish out his stay at Patton State Hospital in order to regain custody of his child." Father told social workers from DCFS he did not want to attend any court hearings in the dependency proceedings until he completed his rehabilitation at Patton. He explained the hearings "distract[ed] him and interfere[d] with his recovery." The paternal grandmother also told DCFS father did not want to attend the upcoming hearing, and she signed a waiver of appearance on father's behalf, as his conservator.
DCFS attached to its report a June 30, 2004 letter from a social worker at Patton, explaining: "During the first sixty-days of [father]'s hospitalization he was not yet stabilized on his medication. However, within the last 30 days [father]'s medication appears to be stable and he remains medication compliant although he still displays some signs of anxiety. However, this behavior does not impact his ability to interact appropriately with staff and his peers." The social worker described father as "polite and cooperative" and stated father "often speaks of his son and his desire to `get better' so that he may some-day be reunited with him." The social worker believed visits with James "could very well be a factor in [father]'s recovery."
At the July 14, 2004 hearing to decide whether reunification services should be terminated, father's attorney referenced the June 30, 2004 letter from the social worker at Patton, and informed the juvenile court she was submitting the matter "since it appears that [father] will not any time soon be ready to have the child returned to him and at such time that he is, [she] could file a 388 [petition]." The paternal grandfather addressed the court. He said father was doing well at Patton and the court "should give him a chance." The juvenile court explained to the grandfather the strict timeline applicable to a dependency proceeding involving a child under three years old. The court stated it could not return James "to a man that's in Patton State Hospital." The court terminated father's reunification services and set the manner for a permanency planning hearing.
In a report prepared for the permanency planning hearing, DCFS informed the juvenile court James was visiting father at Patton "approximately every other week." In a status review report for a January 12, 2005 hearing, DCFS reported father had been released from Patton in November 2004 and was serving a sentence in prison.[3] DCFS also stated the paternal grandparents were no longer father's conservators.
At the January 12, 2005, hearing, the juvenile court identified adoption as the permanent plan for James. The maternal grandparents wanted to adopt James and DCFS was working on getting the home study completed.
The section 366.26 hearing was continued several times for various reasons. Both father's guardian ad litem and his counsel asked the juvenile court to issue an order for father's appearance at the hearing. The court did. Father was not *127 transported for the August 22, 2005 hearing. A note on the order for father's appearance stated: "UNABLE TO TRANSPORT 918 V IN 4 POINTS RESTRAINTS." In anticipation of father's request at the next hearing and to avoid another continuance, James's counsel asked the juvenile court to set the matter for a contested section 366.26 hearing. Father's guardian ad litem said she believed father would want a contested hearing. The court set the matter for a contest.
Father was not present at the September 12, 2005 hearing. Apparently the juvenile court received another note indicating father was in "four-point restraints." Father's guardian ad litem and counsel said the hearing should not go forward because father wanted to be present. The juvenile court questioned whether it was necessary for father to be present at the hearing given a guardian ad litem had been appointed to represent his interests. Nonetheless the court continued the matter and asked the parties to research the issue before the next hearing. The court also issued another order for father's appearance.
On October 14, 2005, the "Statewide office" for tracking inmates notified the juvenile court it was returning to the court the order to transport father to the October 20 hearing because father had been transferred to California Medical Center. Thus, father was not present at the October 20 hearing. Father's counsel requested the juvenile court continue the hearing again. She represented father had spoken with the paternal grandparents the night before and he "was upset that he wasn't brought to court." James's counsel and DCFS's counsel objected to any further continuance. DCFS's counsel argued there was authority supporting the proposition the matter could proceed in father's absence. Father's counsel said father wanted to testify and she planned to call him as a witness. The juvenile court found "good cause to grant one further continuance."
Father did not appear at the continued hearing on December 7, 2005. A handwritten note on the order for his appearance stated: "REFUSED & Waived 11-30-05." Another copy of the same order had a handwritten note stating: "WAVIED [sic] 12-6-05 Willcox." Father's counsel represented the paternal grandparents "could explain why [father] didn't want to come to court." The juvenile court stated it had "been informed his [father's] perception [was] a safety reason." Later, the court explained, "If he [father] doesn't trust the Sheriff of Los Angeles County to protect him, then he's made that choice." Father's counsel said she was ready to proceed and she wanted to call the paternal grandfather to testify. She explained father's "contention is that he has a close bond with the child and that termination of his parental rights would be detrimental to the child." She also asserted father had had "frequent visitation" with James at Patton.
The paternal grandfather testified. He claimed James had lived in his home with father for about 11 months, and father took care of him. The grandfather took James to visit father at Patton State Hospital, "maybe six months a year [sic]." During those visits, father fed James and changed his diaper. Father had not seen James in the last five months. Father talked to James on the phone about six times a month. James's mother also testified. In response to a question from the juvenile court, James's mother said father would be released from prison in December 2006.
The juvenile court found the paternal grandfather's testimony James had lived in *128 his home with father for 11 months to be "completely incredible." James was detained from the paternal grandparents' home two months after he was born and he never lived there again. This discrepancy caused the juvenile court to distrust the balance of the grandfather's testimony, especially the portion about the frequency of James's visits with father at Patton. The court also stated it did not believe "speaking with a two year old over the phone establishes any bond between the parent [and] the child."
The juvenile court terminated father's parental rights. The court found James was adoptable, father's visitation had not been regular, and James would not suffer any detriment if father's parental rights were terminated.

DISCUSSION
Father contends the juvenile court committed reversible error when it appointed a guardian ad litem without inquiring about his competence and explaining the purpose of the appointment. DCFS agrees the juvenile court erred when it appointed a guardian ad litem without advising father of the consequences of the appointment. Given DCFS's concession of error, the focus of our discussion is on our determination whether the juvenile court's error was structural, requiring automatic reversal of the order, or subject to a Chapman[4] harmless error analysis.
Pursuant to Code of Civil Procedure section 372, subdivision (a), a parent in a dependency proceeding who is incompetent shall appear by a guardian ad litem appointed by the juvenile court.[5] The appointment should be made if the court finds by a preponderance of the evidence that the parent is incompetent within the meaning of Penal Code section 1367 or Probate Code section 1801.[6] "The test for incompetence in this context is whether the party has the capacity to understand the nature or consequences of the proceedings, and is able to assist counsel in preparation of the case."[7]
"The introduction of a guardian ad litem into the case is no small matter. The effect of the appointment is to remove control over the litigation from the parent, whose vital rights are at issue, and transfer it to the guardian."[8] In the case of dependency proceedings, the litigation can affect the fundamental parental "right to the companionship, care, custody, and management of one's own child."[9] The guardian ad litem is given the power to control "trial tactics" as well as the "procedural steps necessary to the conduct of the litigation."[10] For example, the guardian ad litem has the power to waive the parent's right to a contested hearing at critical stages of the proceedings. Given the appointment of a guardian ad litem deprives a parent of the right to control and participate in dependency litigation,[11] a *129 "parent's due process rights must be protected before a guardian ad litem is appointed."[12]
Where a parent refuses to consent to the appointment of a guardian ad litem (or is not asked to do so), and the parent's counsel requests the juvenile court appoint a guardian, the court must hold an informal hearing before making the appointment and allow the parent an opportunity to be heard on whether the appointment of a guardian ad litem is necessary.[13] "At the informal hearing, the court or counsel must explain [to the parent] the purpose of a guardian ad litem, why counsel believes the appointment is necessary, and what authority the parent will cede to the guardian ad litem."[14] Moreover, "the court should make an inquiry sufficient to satisfy it that the parent is, or is not, competent" under the standard set forth above.[15] The informal hearing provides the juvenile court with an "opportunity to inquire of both the parent and the attorney to gain a full understanding of the circumstances."[16]
In this case, the juvenile court did not explain to father what a guardian ad litem is or what a guardian ad litem does. The court did not apprise father of the significant rights which would be transferred away from father and to the guardian ad litem upon appointment. Given father had no idea what purpose the guardian ad litem would serveas the record makes clearfather was not afforded a meaningful opportunity to be heard on whether he believed the appointment was necessary. Father's due process rights were not protected. DCFS concedes the error.[17]
As we discuss below, there is a split of authority in the appellate courts as to whether the erroneous appointment of a guardian ad litem for a parent in a dependency proceeding constitutes a structural error requiring automatic reversal or whether it is a trial error subject to a harmless error analysis. As the United States Supreme Court explained in Arizona v. Fulminante,[18] "structural" errors involve "`basic protections [without which] a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair.' [Citation.]" California courts have applied this same structural error analysis to dependency proceedings "in analogous situations in which the fundamental constitutional right to parent is the subject of *130 some error."[19] In the criminal context, structural errors "include the total deprivation of the right to counsel at trial, a biased judge, unlawful exclusion of members of the defendant's race from a grand jury, denial of the right to self-representation at trial, denial of the right to a public trial, and an erroneous reasonable doubt instruction to the jury."[20] In the case of structural error, automatic reversal of the order or judgment is required "without regard to the strength of the evidence or other circumstances."[21]
In Arizona v. Fulminante, the United States Supreme Court defined "trial" error as error "which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt" under the Chapman standard.[22] The Supreme Court explained the harmless error doctrine "is essential to preserve the `principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error.' [Citation.]"[23] The Supreme Court cited the erroneous admission of evidence as an example of trial error subject to a harmless error analysis.[24]
In In re C.G.,[25] Division Four of this appellate district in an opinion authored by Presiding Justice Epstein concluded the juvenile court's error in appointing a guardian ad litem without explaining to the mother the nature of the appointment or making an adequate inquiry into her competence was structural error requiring automatic reversal of the order placing the dependent child under legal guardianship. The appellate court emphasized the "erroneous appointment of the guardian ad litem deprived mother of her status as a party in the case" where her basic right to the companionship, care, custody and management of her child was at stake.[26] The juvenile court transferred to the guardian ad litem the mother's "right to be consulted, to express positions and interests, and ... to give or withhold consent to a course of action."[27] The mother's attorney was permitted to take direction from the guardian ad litem, rather than the mother. The attorney had no obligation to keep the mother "informed of what was going on in court, or even solicit[] her views."[28]
*131 Subsequently, in In re Enrique G.,[29] Division One of the Fourth Appellate District concluded "the appointment of a guardian ad litem in violation of a parent's due process rights is a trial error, not a structural one." The juvenile court in that case also had appointed a guardian ad litem without explaining to the mother the nature of the appointment or making an adequate inquiry into her competence. In support of its conclusion, the Court of Appeal in In re Enrique. G. cited other appellate court decisions which had applied a Chapman harmless error standard to this type of error.[30] The court also stated the "erroneous appointment of the guardian ad litem in this case is not like other errors that have been found to be structural" (such as "the failure to attempt to give a parent statutorily required notice of a selection and implementation hearing"[31] and the failure to serve the mother with the status report at least 10 days before the review hearing at which the juvenile court set a section 366.26 hearing[32]).[33] The court found it could "assess the harm resulting from" the erroneous appointment of the guardian ad litem, and concluded the error was harmless beyond a reasonable doubt.[34]
Were we to conclude a Chapman harmless error analysis is applicable to this type of error, we would find the error in this case to be harmless beyond a reasonable doubt. Based on the record before us, it is clear the juvenile court would have assumed jurisdiction and eventually terminated father's reunification services and parental rights regardless of whether the court had erroneously appointed the guardian ad litem. We cannot conceive of any additional testimony father could have presented or evidence he could have submitted which would have altered these outcomes. During the pendency of these proceedings, father was never ready to assume custody of James due to his mental condition and his incarceration. James's contact with father during the first two months of his life, his brief period of visitation with father at Patton, and his telephone calls with father could not have created the type of bond and parent-child relationship necessary to force this child to forgo adoption.[35]
Notwithstanding these facts, and keeping in mind "[t]ime is of the essence in dependency matters,"[36] we conclude the erroneous appointment of the guardian ad *132 litem in this case was structural error requiring automatic reversal of the order terminating father's parental rights. The juvenile court stripped father of the right to participate in litigation involving his entitlement to the companionship, care and custody of his son without affording him the process he was due. The court took away father's status as a partyessentially giving father's counsel and guardian ad litem the power to disregard father's wisheswithout telling him why or even that it was doing so. If this is not structural error, it is difficult to understand how any error in a dependency proceeding could be deemed structural error. We are also mindful of another important consequence of the decision to categorize this error as structural rather than merely trial error. That is its effect on the trial bench and the enhanced incentive to avoid error of this nature. When a trial court knows a given misstep will result in certain reversal, it will have far more reason to dot the "i's" and cross the "t's" than if the judge can count on the possibility, indeed probability, the appellate court will deem the error harmless. In this case, the judge ignored repeated objections and warnings from trial counsel reminding the court it had not made the proper explanations and inquiries before appointing the guardian ad litem. As a matter of fact, the juvenile court misrepresented the functions and powers of the guardian ad litem, telling father he was merely receiving the benefit of a "second lawyer." It is unlikely the juvenile court would have ignored those warnings if automatic reversal were perceived as the sanction for doing so.
We follow the lead of Division Four of this appellate district.[37] Regardless of the strength of the evidence against father, this error requires automatic reversal of the order terminating father's parental rights.[38]
The dissent argues our ability to conduct a harmless error analysis in this case "strongly suggests" the error at issue cannot be deemed structural. As the United States Supreme Court has acknowledged, "the difficulty of assessing the effect of the error" is not the "only criterion [courts] have used" in deciding whether or not an error is structural.[39] In some cases, it is "the irrelevance of harmlessness" which indicates a structural error.[40] We find this to be such a case. Father was stripped of his status as a party with no explanation or assessment of whether this procedure was even necessary. In the absence of due process, everyone was free to ignore father's requests and wishes in a case about James's future and father's relationship with James.[41] Contrary to the dissent's *133 position, we believe the appointment of a guardian ad litem under these circumstances "undermine[s] the integrity [and] fundamental fairness of the dependency proceeding itself." Reversal is required. The presence or absence of harm is irrelevant. In certain cases, our evaluation of the process used to achieve the ultimate outcome in the case must take precedence over an evaluation of the merits of that outcome. This is one of those cases.

DISPOSITION
The order terminating father's parental rights and the order appointing the guardian ad litem are reversed. The matter is remanded for further proceedings consistent with this opinion.
I concur: ZELON, J.
PERLUSS, P.J., Dissenting.
I respectfully dissent.
Without question appointment of a guardian ad litem for an incompetent parent is a significant step in a dependency proceeding, directly affecting that parent's fundamental interest in the companionship and care of his or her child. (See, e.g., In re Daniel S. (2004) 115 Cal.App.4th 903, 912, 9 Cal.Rptr.3d 646; In re Jessica G. (2001) 93 Cal.App.4th 1180, 1186-1187, 113 Cal.Rptr.2d 714.) "`[A] guardian ad litem has broad powers.... [T]he decisions made [by a guardian ad litem] can affect the outcome of the dependency proceeding, with a corresponding effect on the parent.' [Citation.]" (In re C.G. (2005) 129 Cal. App.4th 27, 34, 27 Cal.Rptr.3d 872.) Accordingly, as the majority properly explains, absent the parent's knowing consent, the parent must be afforded due process, including notice and an opportunity to be heard, before the appointment may be made. (E.g., In re Enrique G. (2006) 140 Cal.App.4th 676, 683-684, 44 Cal.Rptr.3d 724; Jessica G., at p. 1187,113 Cal.Rptr.2d 714.)
That an important constitutional right is involved, however, does not determine whether violation of that right is "structural error" requiring automatic reversal of a judgment or order or whether, like most federal constitutional violations, it will result in a reversal only if prejudice is demonstrated. (Neder v. United States (1999) 527 U.S. 1, 8, 119 S.Ct. 1827, 144 L.Ed.2d 35 ["'[I]f the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other [constitutional] errors that may have occurred are subject to harmless-error analysis.'"]; Arizona v. Fulminante (1991) 499 U.S. 279, 309-310 [111 S.Ct. 1246, 113 L.Ed.2d 302]; Washington v. Recuenco (2006) ___ U.S. ___, ___, 126 S.Ct. 2546, 2551, 165 L.Ed.2d 466 ["'"[M]ost constitutional errors can be harmless."' ... Only in rare cases has this Court held that an error is structural, and thus requires automatic reversal. In such cases, the error `necessarily renders a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence.' [Citation.]"].)
Structural errors are those that "defy analysis by `harmless-error' standards" because they "affect[] the framework within which the trial proceeds," and are not "simply an error in the trial process itself." (Arizona v. Fulminante, supra, 499 U.S. at pp. 309-310, 111 S.Ct. 1246.) "Such errors include the denial of counsel [citation], the denial of the right of self-representation [citation], the denial of the right to public trial [citation], and the denial of the right to trial by jury by the giving of a defective reasonable-doubt instruction [citation]." (United States v. Gonzalez-Lopez (2006) ___ U.S. ___, ___, 126 S.Ct. 2557, 2563-2565,165 L.Ed.2d 409.)
*134 A number of Courts of Appeal have reviewed cases involving the juvenile court's violation of a parent's due process rights in the appointment of a guardian ad litem; and all but oneDivision Four of this court in In re C.G., supra, 129 Cal. App.4th 27, 27 Cal.Rptr.3d 872have applied the Chapman v. California (1967) 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 harmless error standard to determine whether reversal is required. (See, e.g., In re Enrique G., supra, 140 Cal.App.4th at pp. 684-685, 44 Cal.Rptr.3d 724; In re Daniel S., supra, 115 Cal.App.4th at pp. 912-913, 9 Cal.Rptr.3d 646; In re Sara D. (2001) 87 Cal.App.4th 661, 673, 104 Cal. Rptr.2d 909.) And even Presiding Justice Epstein, the author of In re C.G., held the erroneous appointment of a guardian ad litem was subject to harmless error analysis the first time he considered the issue. (In re Jessica G., supra, 93 Cal.App.4th at p. 1189,113 Cal.Rptr.2d 714.)
Unlike my colleagues in the majority, I believe those courts that have applied the Chapman harmless error standard are correct. In contrast to those few cases in which errors of constitutional proportion involving inadequate notice of dependency proceedings have been found to be structural (see, e.g., Judith P. v. Superior Court (2002) 102 Cal.App.4th 535, 553-558, 126 Cal.Rptr.2d 14 [failure to provide parent and children with status report at least 10 days before hearing as required by statute per se reversible error absent a continued hearing or express waiver]; In re Jasmine G. (2005) 127 Cal.App.4th 1109, 1116, 26 Cal.Rptr.3d 394 [failure to attempt to provide parent with statutorily required notice of selection and implementation hearing is structural defect]), the violation of a parent's procedural due process rights in the appointment of a guardian ad litem does not undermine the integrity or fundamental fairness of the dependency proceeding itself or render it an unreliable vehicle for determining the parent's rights or the child's best interests. (See Washington v. Recuenco, supra, ___ U.S. at p. ___, 126 S.Ct. at p. 2551; Arizona v. Fulminante, supra, 499 U.S. at p. 310, 111 S.Ct. 1246.) Indeed, the erroneous appointment of a guardian ad litem seems most akin to the improper exclusion of a criminal defendant from triala violation of the defendant's fundamental right to be present at critical stages of the criminal proceedings. (See People v. Bradford (1997) 15 Cal.4th 1229, 1356-1357, 65 Cal.Rptr.2d 145, 939 P.2d 259 ["a defendant has a federal constitutional right, emanating from the confrontation clause of the Sixth Amendment and the due process clause of the Fourteenth Amendment, to be present at any stage of the criminal proceedings `that is critical to its outcome if his presence would contribute to the fairness of the procedure.' [Citation.]"]) Like the exclusion of the criminal defendant, the appointment of a guardian ad litem potentially deprives the parent of the ability to participate directly in the dependency proceedings. (See In re C.G., supra, 129 Cal.App.4th at p. 34, 27 Cal.Rptr.3d 872; In re Sara D., supra, 87 Cal.App.4th at p. 668, 104 Cal.Rptr.2d 909.) Yet, "[e]rroneous exclusion of the defendant is not structural error that is reversible per se, but trial error that is reversible only if the defendant proves prejudice." (People v. Perry (2006) 38 Cal.4th 302, 312, 42 Cal.Rptr.3d 30, 132 P.3d 235.)
Similarly, as the majority opinion itself acknowledges, the potential prejudicial effect of the juvenile court's error in appointing a guardian ad litem without proper procedural protections for the parent can be assessed. Here, the majority concludesand I agreethat any error was in fact harmless beyond a reasonable doubt: Whether or not the juvenile court *135 erroneously appointed a guardian ad litem, it would have assumed jurisdiction over James F. and eventually terminated Marcus M.'s parental rights. Our ability to make that determination strongly suggests the error itself cannot properly be termed "structural." (See Arizona v. Fulminante, supra, 499 U.S. at pp. 309-310, 111 S.Ct. 1246; In re Enrique G, supra, 140 Cal. App.4th at p. 686, 44 Cal.Rptr.3d 724.)
The majority opinion, like Presiding Justice Epstein's opinion in In re C.G., supra, 129 Cal.App.4th at page 34, 27 Cal. Rptr.3d 872, upon which it relies, offers little analysis or explanation for its conclusion the erroneous appointment of a guardian ad litem in this case is properly classified as structural error other than noting the decisions of a guardian ad litem can affect the outcome of the dependency proceedings. Yet constitutionally ineffective assistance by a parent's appointed counsel can also have a profound impact on the outcome of the dependency proceedings. But there is no question that, to prevail on an ineffective assistance of counsel claim, a criminal defendant or a parent in a dependency proceeding must establish not only that his or her counsel's representation fell below an objective standard of reasonableness but also that there is a reasonable probability, but for counsel's deficient performance, the result of the trial would have been different. (Strickland v. Washington (1984) 466 U.S. 668, 686-687, 104 S.Ct. 2052, 80 L.Ed.2d 674; People v. Williams (1997) 16 Cal.4th 153, 215, 66 Cal.Rptr.2d 123, 940 P.2d 710; see In re Kristin H. (1996) 46 Cal.App.4th 1635, 1667-1668, 54 Cal.Rptr.2d 722 [to demonstrate his attorney provided ineffective assistance in dependency proceedings, father must show both that acts of counsel fell below objective standard of conduct required of competent, diligent juvenile dependency advocate and that he was prejudiced by counsel's alleged failures].)
I see no compelling reason to classify ineffective assistance of counsel as "trial error" subject to harmless-error analysis but to require automatic reversal whenever a parent's procedural rights have been infringed during appointment of a guardian ad litem.
Finally, as a practical matter, it seems unwise to stretch the concept of structural error to include an error in appointment of a guardian ad litem in light of the strong countervailing interest, expressed by both the Legislature and the California Supreme Court, that dependency actions be resolved expeditiously. (Welf & Inst. Code, § 352, subd. (b); In re Jesusa V. (2004) 32 Cal.4th 588, 625, 10 Cal.Rptr.3d 205, 85 P.3d 2; In re Malinda S. (1990) 51 Cal.3d 368, 384, 272 Cal.Rptr. 787, 795 P.2d 1244.) "That goal would be thwarted if the proceeding had to be redone without any showing the new proceeding would have a different outcome." (Jesusa V., at p. 625,10 Cal.Rptr.3d 205, 85 P.3d 2.) Yet that is precisely what the majority mandates in this case: Although three-year-old James F. has been found adoptable and freed for adoption, any effort to provide him with the stability of a permanent home must now be abated while the juvenile court repeats a series of hearings we all agree will come to exactly the same result. In my view, that is too high a price for a young child to pay for analytic purity.
For all these reasons, I respectfully dissent.
NOTES
[1] Statutory references are to the Welfare and Institutions Code unless otherwise noted.
[2] Because James's mother is not a party to this appeal, we will not discuss the facts which relate only to the case against her.
[3] In June 2005, DCFS reported father had not had any visits with James in prison.
[4] Chapman v. California (1967) 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705.
[5] In re C.G. (2005) 129 Cal.App.4th 27, 32, 27 Cal.Rptr.3d 872.
[6] In re Sara D. (2001) 87 Cal.App.4th 661, 667, 104 Cal.Rptr.2d 909.
[7] In re Jessica G. (2001) 93 Cal.App.4th 1180, 1186, 113 Cal.Rptr.2d 714.
[8] In re Jessica G, supra, 93 Cal.App.4th at pages 1186-1187, 113 Cal.Rptr.2d 714.
[9] In re C.G., supra, 129 Cal.App.4th at page 34, 27 Cal.Rptr.3d 872.
[10] In re Sara D., supra, 87 Cal.App.4th at page 668, 104 Cal.Rptr.2d 909; In re Jessica G., supra, 93 Cal.App.4th at page 1187, 113 Cal.Rptr.2d 714.
[11] In re C.G., supra, 129 Cal.App.4th at page 34, 27 Cal.Rptr.3d 872.
[12] In re Daniel S. (2004) 115 Cal.App.4th 903, 912, 9 Cal.Rptr.3d 646.
[13] In re Sara D., supra, 87 Cal.App.4th at pages 668, 671, 104 Cal.Rptr.2d 909.
[14] In re Enrique G. (2006) 140 Cal.App.4th 676, 684, 44 Cal.Rptr.3d 724.
[15] In re Sara D., supra, 87 Cal.App.4th at page 672, 104 Cal.Rptr.2d 909.
[16] In re Sara D., supra, 87 Cal.App.4th at page 671, 104 Cal.Rptr.2d 909.
[17] Moreover, there is no indication the juvenile court made an adequate inquiry into father's competencewhether father had the capacity to understand the nature or consequences of the proceedings, and was able to assist counsel in preparation of the casebefore the court appointed the guardian ad litem. Whether the record supports the conclusion father was incompetent at the time the juvenile court appointed the guardian ad litem is irrelevant to our determination of error. The "question is not whether the evidence supports a finding of incompetence, but whether [father] was afforded [his] constitutional right to due process of the law." (In re Joann E. (2002) 104 Cal.App.4th 347, 358, 128 Cal.Rptr.2d 189.)
[18] Arizona v. Fulminante (1991) 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302.
[19] Judith P. v. Superior Court (2002) 102 Cal. App.4th 535, 554, 126 Cal.Rptr.2d 14; In re C.G., supra, 129 Cal.App.4th at page 33, 27 Cal.Rptr.3d 872.
[20] In re Enrique G, supra, 140 Cal.App.4th at page 685, 44 Cal.Rptr.3d 724, citing Arizona v. Fulminante, supra, 499 U.S. at pages 309-310, 111 S.Ct. 1246.
[21] In re Enrique G., supra, 140 Cal.App.4th at page 685, 44 Cal.Rptr.3d 724.
[22] Arizona v. Fulminante, supra, 499 U.S. at pages 307-308, 111 S.Ct. 1246; Judith P. v. Superior Court, supra, 102 Cal.App.4th at page 555, 126 Cal.Rptr.2d 14.
[23] Arizona v. Fulminante, supra, 499 U.S. at page 308, 111 S.Ct. 1246.
[24] Arizona v. Fulminante, supra, 499 U.S. at page 310, 111 S.Ct. 1246.
[25] In re C.G., supra, 129 Cal.App.4th at page 34, 27 Cal.Rptr.3d 872.
[26] In re C.G., supra, 129 Cal.App.4th at page 34, 27 Cal.Rptr.3d 872.
[27] In re C.G., supra, 129 Cal.App.4th at page 34, 27 Cal.Rptr.3d 872.
[28] In re C.G, supra, 129 Cal.App.4th at page 34, 27 Cal.Rptr.3d 872.
[29] In re Enrique G., supra, 140 Cal.App.4th at page 685, 44 Cal.Rptr.3d 724.
[30] In re Enrique G., supra, 140 Cal.App.4th at pages 685-686, 44 Cal.Rptr.3d 724, citing In re Daniel S., supra, 115 Cal.App.4th at pages 908, 912-916, 9 Cal.Rptr.3d 646, In re Sara D., supra, 87 Cal.App.4th at pages 672-673, 104 Cal.Rptr.2d 909.
[31] In re Jasmine G. (2005) 127 Cal.App.4th 1109, 1116, 26 Cal.Rptr.3d 394.
[32] Judith P. v. Superior Court, supra, 102 Cal. App.4th at pages 553-558, 126 Cal.Rptr.2d 14.
[33] In re Enrique G., supra, 140 Cal.App.4th at page 686, 44 Cal.Rptr.3d 724.
[34] In re Enrique G., supra, 140 Cal.App.4th at page 686, 44 Cal.Rptr.3d 724.
[35] To satisfy the burden of proving the exception to termination of parental rights under section 366.26, subdivision (c)(1)(A), a parent has to demonstrate he or she "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." Under the second prong of this exception, a parent must demonstrate his or her relationship with the child "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (In re Autumn H. (1994) 27 Cal. App.4th 567, 575, 32 Cal.Rptr.2d 535.)
[36] In re Daniel S., supra, 115 Cal.App.4th at page 913, 9 Cal.Rptr.3d 646.
[37] In re C.G., supra, 129 Cal.App.4th 27, 27 Cal.Rptr.3d 872.
[38] Because we reverse the order terminating father's parental rights on this basis, we need not address father's other contention the juvenile court committed reversible error when it failed to obtain a knowing waiver of father's right to be present at the hearing where the court terminated his parental rights.
[39] United States v. Gonzalez-Lopez (2006) ___ U.S. ___, ___, footnote 4, 126 S.Ct. 2557, 2564, footnote 4, 165 L.Ed.2d 409.
[40] United States v. Gonzalez-Lopez, supra ___ U.S. at page ___, footnote 4, 126 S.Ct. at page 2564, footnote 4; McKaskle v. Wiggins (1984) 465 U.S. 168, 177, footnote 8, 104 S.Ct. 944, 79 L.Ed.2d 122 ("Since the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant, its denial is not amenable to `harmless error' analysis").
[41] We find the improper denial of the right to be present at a criminal trial and the denial of effective assistance of counsel to be qualitatively different from the improper denial of parent's status as a party in a dependency proceeding, notwithstanding the dissent's attempt to equate these situations.