Filed 7/23/13  In re A.B. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re A.B., a Person Coming Under the Juvenile Court Law. | B246208 |
| | (Los Angeles County Super. Ct. No. CK90505) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. EBONY B., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Mark A. Borenstein.  Reversed and remanded.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Peter Ferrera, Senior Deputy County Counsel, for Plaintiff and Respondent.

Ebony B. (mother) appeals the termination of her parental rights to A.B., born in February 2010.  Because we find that the juvenile court did not comply with the requirements of the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.), we conditionally reverse the termination order for the limited purpose of providing ICWA notice.

## FACTUAL AND PROCEDURAL BACKGROUND

On October 21, 2011, the Department of Children and Family Services (DCFS or department) received a report that mother had called the police early that morning and said someone was watching her hotel room and listening to her conversations.  Law enforcement responded and found 20-month-old A.B. asleep in mother's bed.  Mother said that she, C.B. (father), and A.B. lived together in Kansas and had come to Los Angeles on vacation on October 19, 2011.  She said father had dropped her and A.B. at a family friend's home and then left.  The friend brought mother and A.B. to the hotel the previous evening.  Mother said about midnight, someone knocked on the door selling drugs.  Mother admitted purchasing and using methamphetamine.  She said that shortly after she used the drug, she started hearing voices and seeing things.  She initially said it was the first time she used illegal drugs, but later said she had been using methamphetamines for about a year and a half.  She said she and father were married and father was AWOL from the military.

A.B. was detained on October 21, 2011, and placed in foster care.  DCFS filed a juvenile dependency petition on October 26, 2011, alleging jurisdiction over A.B. pursuant to Welfare and Institutions Code section 300, subdivision (b).[1]  The petition asserted mother had a history of drug use and was under the influence of illegal drugs while caring for A.B. on October 21, 2011, endangering A.B.'s physical health and safety and placing her at risk of harm.  The petition further asserted that A.B. may have Indian

---

[1]     All further statutory references are to the Welfare and Institutions Code.

ancestry, noting that mother told a children's social worker (CSW) that her family had Native American heritage through the Blackfoot tribe. On October 23, 2011, mother filed a "Parental Notification of Indian Status" stating that A.B. may be eligible for membership in the Cherokee or Blackfoot tribes through her maternal grandmother.

On October 26, 2011, the juvenile court found a prima facie case for detaining A.B., substantial danger existed to her physical or emotional health, and there were no reasonable means to protect her without removing her from her parents' custody. Mother did not contest A.B.'s detention but denied the allegations of the petition. The court ordered DCFS to investigate mother's claim of Native American heritage and to provide mother with reunification services and referrals to substance abuse programs. It ordered mother to submit to weekly substance abuse testing and granted her twice-weekly monitored visits with A.B.

DCFS filed a jurisdiction and disposition report on December 5, 2011. It stated that mother's and father's whereabouts were unknown. The CSW had left several phone messages for mother requesting a return phone call, but mother had not called back, and neither mother nor father had contacted the foster parent. As of the writing of the report, DCFS had not been able to verify that father was or had ever been in the military. Further, the CSW had been unable to investigate mother's claim of Native American heritage because mother's family had not made itself available for an interview.

On December 5, 2011, the CSW spoke with mother, who stated that she had entered a drug rehabilitation program. Mother said prior to entering drug rehabilitation, she had "been completely stupid. I got into a bad, bad phase of using weed and some meth." She said she would like to be sober and reunify with A.B. A.B.'s foster parent reported that mother had been calling regularly and speaking to A.B. on the telephone. Mother tested negative for drug use on December 14, 2011.

The court held a jurisdiction and disposition hearing on January 4, 2012. Mother appeared and waived her right to contest the allegations of the amended petition, and the court sustained the allegations of paragraph (b)(1). The court granted mother reunification services and monitored visitation with A.B. It ordered mother to complete a

3

drug and alcohol rehabilitation program, to submit to random or on-demand drug testing, to participate in parenting education, and to attend individual counseling.

The July 3, 2012 DCFS status report advised the court that A.B. appeared to be thriving in the home of her foster parents. Mother consistently attended biweekly monitored visits with A.B. and generally behaved appropriately. However, on May 18, 2012, the CSW observed that mother "showed strange behavior which may have indicated the recent use of substances. Mother was extremely unkempt, twitchy, agitated and spastic." When asked about her behavior, mother said she "did not feel well due to her allergies and medication she took the previous night." Further, mother had not been enrolled in court-ordered counseling or drug and alcohol programs since February 24, 2012, when she left a program in which she had been enrolled, and she had not consistently submitted to random drug testing. Mother missed random drug tests on February 24, April 30, and May 10, 2012, but tested negative for drug or alcohol use on January 17, February 8, March 7, and April 3, 2012. On May 15, 2012, the foster parent reported to DCFS that A.B. had been waking in the night crying, "mommy hit, mommy hit." She also reported that when A.B. was near stairs, she became terrified and refused to descend the stairs, saying, "mommy push, mommy push." The foster parent reported A.B. had the same reaction when she was about to go down the slide at the park. DCFS recommended that A.B. remain in foster care and that mother continue receiving reunification services during the next period of supervision.

Mother appeared at a July 3, 2012 hearing, at which A.B.'s counsel requested a contested hearing concerning whether mother's reunification services should be continued. The court set the matter for an August 22, 2012 hearing and ordered mother to return on that date "without any further notice, order or subpoena."

On August 22, 2012, DCFS advised the court that since July 3, mother had not contacted DCFS and the CSW had been unable to contact mother. Mother had failed to submit to random drug testing on June 25, July 10, August 1, and August 7. On August 1, mother failed to attend her scheduled monitored visit with A.B. and the caregiver reported that mother had not phoned A.B. in over a month. Mother attended

4

her scheduled monitored visit on August 3, but the monitor reported that "the difference in her (mother's) appearance from last week to this week was very disturbing and striking. She was so thin I could see her skull. She was extremely anxious, irritated and fidgety and she could not sit still. She appeared to be covered in meth sores and scabs." Mother did not show up for scheduled visits with A.B. on August 8, 10, or 15. Based on the foregoing, DCFS suggested that mother appeared to have relapsed, and it recommended that the court terminate mother's family reunification services.

The court held a six-month review hearing on August 22, 2012, at which mother was not present. A.B.'s counsel urged that mother had not substantially participated in the case plan other than visiting A.B., and it was unlikely she would be able to regain custody in the next six months. Counsel therefore asked the court to terminate reunification services. Mother's counsel urged there was a substantial probability that A.B. would be returned to mother in the next six months and requested that mother's reunification services be continued. Counsel said he had not been able to reach his client and did not know if she was aware of the department's recommendation to terminate services. He had attempted to reach mother that morning, but had not gotten a return phone call.

The court found that continued court jurisdiction was necessary and, by a preponderance of the evidence, that return of A.B. to mother would create a substantial risk of detriment to A.B.'s safety, protection, and physical and emotional well-being. It found mother had not actively participated in court-ordered programs except for visitation, had not regularly drug-tested, and had not participated in appropriate programs. Thus, it found a substantial probability that A.B. would not be returned to her parents by the 12-month hearing, that mother had not regularly and consistently made progress in her programs, and that mother had not demonstrated the capacity and ability to complete the objectives of her treatment plan. The court thus terminated reunification services and set a section 366.26 hearing.

DCFS published notification of the 366.26 hearing in the Los Angeles Bulletin on October 29, 2012. Further, DCFS attempted to serve mother with notice of the hearing

5

by certified mail at addresses mother had provided previously in Missouri, Kansas, Kentucky, and California.

DCFS filed a section 366.26 report on December 19, 2012. It stated that A.B. had had no contact with her parents during the most recent period of supervision because the whereabouts of the parents were unknown. A.B.'s foster parents wished to adopt her and their adoption home study had been approved. A.B. was reported to be very attached to her foster parents and to be thriving in their home. Based on the foregoing, DCFS recommended that parental rights for mother and father be terminated and A.B. be released for adoption.

Mother did not appear at the December 19, 2012 hearing. Her attorney appeared and stated that he had tried to reach mother at the last telephone number he had for her, but the number was not in service: "Your Honor, my client is not present. I . . . don't know why she's not present. I did try to reach her at the last telephone number I had for her. That number was not in service." He therefore requested that the hearing be continued. On the merits, counsel acknowledged that he did not have any recent direction from mother because she had failed to maintain contact with his office since August 22, 2012, but said he knew based on past contact that mother opposed termination of her parental rights. He therefore objected to termination on mother's behalf. County counsel and A.B.'s counsel opposed continuing the hearing and urged that terminating parental rights was in A.B.'s best interests.

The court denied the request for a continuance, terminated mother's and father's parental rights, and designated A.B.'s foster parents as her prospective adoptive parents. Mother timely appealed.

## DISCUSSION

Mother contends: (1) the trial court abused its discretion by denying her motion to continue the section 366.26 hearing; (2) she was denied due process when her parental

6

rights were terminated in her absence; and (3) DCFS's failure to comply with the ICWA mandates reversal of the termination order. We consider these issues below.

**I.     The Trial Court Did Not Abuse Its Discretion by Denying Mother's Request for a Continuance**

Continuance of juvenile court hearings are governed by section 352, which provides in relevant part that upon request, the juvenile court may continue a hearing beyond the time limit within which the hearing is otherwise required to be held, "provided that no continuance shall be granted that is contrary to the interest of the minor." In considering the minor's interests, the court shall give "substantial weight" to "a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements." Continuances shall be granted "only upon a showing of good cause and only for that period of time shown to be necessary by the evidence presented at the hearing on the motion for the continuance." (§ 352, subd. (a).) We review the denial of a continuance for abuse of discretion. (*In re Giovanni F*. (2010) 184 Cal.App.4th 594, 604-605.)

Mother urges that it was an abuse of discretion to refuse to continue the hearing because she was not aware of the hearing and a continuance would not have caused A.B. any harm. We do not agree. Continuances are discouraged in dependency cases so that children may receive loving and secure home environments as soon as reasonably possible. (*In re Giovanni F*., *supra*, 184 Cal.App.4th at p. 604; *In re James F*. (2008) 42 Cal.4th 901, 918.) The need to expeditiously resolve dependency cases is especially great in the case of very young children like A.B., who is only two years old. (See *Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 847, fn. 4 [courts "have long recognized that providing children expeditious resolutions is a core concern of the entire dependency scheme. [Citations.] If this is true of dependency cases in general, it is doubly true for the very young."].)

7

Further, to the extent mother was not aware of the section 366.26 hearing, it was because she had not kept DCFS or her attorney apprised of her whereabouts or provided them with a working telephone number or any other way to contact her. Continuing the hearing would not have assured mother's attendance at any future hearing—because they did not know how to contact her, the department and mother's attorney would have been equally unable to provide her with actual notice of that hearing. In short, contrary to mother's contention, there was no reason to believe that a brief continuance of the hearing would have made it possible for mother to attend any future hearing. For these reasons, the court did not abuse its discretion in denying mother's request to continue the hearing.

**II.     Terminating Mother's Parental Rights Did Not Violate Her Right to Due Process**

Section 294 sets out the manner in which DCFS must provide notice of a section 366.26 hearing to terminate parental rights. Mother does not challenge the juvenile court's finding that DCFS complied with this section; indeed, she concedes that "[i]n terms of the use of the United States Postal Service in an effort to reach mother, the department is not really subject to criticism. It mailed numerous notices to a variety of addresses. It did so utilizing registered mail, with return receipts requested." Mother contends, however, that her due process rights were violated because her parental rights were terminated at a hearing of which she did not have actual notice. For the following reasons, we do not agree.

"Notice is both a constitutional and statutory imperative. In juvenile dependency proceedings, due process requires parents be given notice that is reasonably calculated to advise them an action is pending and afford them an opportunity to defend. (See, e.g., *In re DeJohn B*. (2000) 84 Cal.App.4th 100, 106.)" (*In re Jasmine G*. (2005) 127 Cal.App.4th 1109, 1114 (*Jasmine G.*).)

In *Jasmine G.*, the mother of a dependent child was not given notice of a section 366.26 hearing at which her parental rights were terminated—despite the fact that child

8

protection agency had mother's current address and a social worker had spoken with mother by telephone eight times after the section 366.26 hearing was set. (*Jasmine G.*, *supra*, 127 Cal.App.4th at p. 1116.) Under these circumstances, the court held that the agency's failure to make "*any reasonable attempt* to give notice" of the section 366.26 hearing violated her due process rights. (*Ibid.*)

The present case is distinguishable. Mother did not keep DCFS or her attorney apprised of her current address or phone number and, indeed, had no contact with either the agency or her attorney for nearly six months. Nonetheless, DCFS attempted to advise mother of the section 366.26 hearing by sending notices to more than five different addresses mother had provided to the agency at various times. Under these circumstances, we cannot conclude that DCFS failed to make "any reasonable attempt" to give mother notice.

*In re Julian L.* (1998) 67 Cal.App.4th 204 (*Julian L.*), cited by mother, is also distinguishable. There, Julian's mother, while incarcerated, waived her attendance at a permanency planning hearing set for October 1997. The court did not determine a permanency plan at that hearing, instead continuing the hearing to February 1998. Mother apparently was not provided any notice of the continued hearing date. At the February hearing, the court ruled that mother's waiver of attendance at the October hearing applied equally to the February hearing, and it terminated mother's parental rights. (*Id.* at p. 207.) Mother appealed, contending, among other things, that she had not been properly notified of the hearing. The Court of Appeal agreed. (*Id.* at p. 208.) It concluded: "Mother's lack of notice . . . rendered the February 6 hearing anything but fair." (*Id.* at p. 209.)

The present case differs from *Julian L.* in important ways. In *Julian L.*, DCFS apparently made no attempt to provide mother notice of the continued hearing. In contrast, in the present case DCFS attempted to apprise mother of the section 366.26 hearing date by serving her with notice at multiple addresses. To the extent mother did not have actual notice of the hearing, it was because she had not provided DCFS or her

9

attorney with current contact information.  Under these circumstances, proceeding with the hearing in mother's absence did not violate her due process rights.

**III.    DCFS's Failure to Comply With ICWA Requires a Conditional Reversal**

Mother contends that DCFS failed to comply with the ICWA because, although mother had identified possible Indian heritage, DCFS failed to make any contact with the Bureau of Indian Affairs or the identified tribes.  Thus, mother urges, the order terminating her parental rights must be reversed and the case remanded to the juvenile court for compliance with ICWA.  DCFS concedes there is no evidence that notice was provided to the interested tribes, and it does not oppose a reversal of the termination order and a limited remand to the juvenile court for the purpose of providing proper ICWA notice.

"ICWA was enacted to protect the rights of Indian children and tribes. (*Mississippi Choctaw Indians Band v. Holyfield* (1989) 490 U.S. 30, 37 [104 L.Ed.2d 29, 109 S.Ct. 1597].)  '"Indian child" means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe . . . .'  (25 U.S.C. § 1903(4).)  Under ICWA, a party seeking foster care or termination of parental rights must notify an Indian child's tribe of the pending proceedings and of its right to intervene.  (25 U.S.C. § 1912(a).)  The notice provision applies if 'the court knows or has reason to know that an Indian child is involved. . . .'  (*Ibid*.)  . . . .

"If the notice duty is triggered under ICWA, the notice to a tribe must include a wide range of information about relatives . . . to enable the tribe to properly identify the children's Indian ancestry.  (*In re C.D.* (2003) 110 Cal.App.4th 214, 225.)  Any violation of this policy requires the appellate court to vacate the offending order and remand the matter for further proceedings consistent with ICWA requirements.  (*In re Jonathan D.* (2001) 92 Cal.App.4th 105, 111-112.)  On remand, the juvenile court must receive a tribal determination regarding the children's Indian ancestry before continuing the termination and placement proceedings.  (*Ibid*.)

"The circumstances under which a dependency court has reason to know a child is an Indian child are set forth in California Rules of Court, rule 5.481(a)(5), and include, as relevant here, where '[t]he child or a person having an interest in the child, including an Indian tribe, an Indian organization, an officer of the court, a public or private agency, or a member of the child's extended family, *informs or otherwise provides information suggesting that the child is an Indian child* to the court [or] the county welfare agency. . . .' (Italics added)." (*In re J.D.* (2010) 189 Cal.App.4th 118, 123-124, fn. omitted.)

In the present case, mother advised a CSW that her family had Indian heritage and said A.B. might be eligible for membership in the Cherokee or Blackfoot tribes. On October 26, 2011, the juvenile court ordered DCFS to give notice to the tribes and Bureau of Indian Affairs, but there is no evidence in the record that DCFS ever did so. Therefore, because the juvenile court failed to ensure compliance with the ICWA requirements, the court's order terminating parental rights must be conditionally reversed. This "'does not mean the trial court must go back to square one,' but that the court ensures that the ICWA requirements are met. (*In re Suzanna L.* (2002) 104 Cal.App.4th 223, 237; see *In re Francisco W.* (2006) 139 Cal.App.4th 695, 705 ['The limited reversal approach is well adapted to dependency cases involving termination of parental rights in which we find the only error is defective ICWA notice.'].) 'If the only error requiring reversal of the judgment terminating parental rights is defective ICWA notice and it is ultimately determined on remand that the child is not an Indian child, the matter ordinarily should end at that point, allowing the child to achieve stability and permanency in the least protracted fashion the law permits.' (*In re Francisco W.*, *supra*, at p. 708.)" (*In re Gabriel G.* (2012) 206 Cal.App.4th 1160, 1168.)

## DISPOSITION

The December 19, 2012 order terminating parental rights is reversed and the case is remanded to the juvenile court with directions to order DCFS to provide proper notice

11

of the proceedings under ICWA.  If, after receiving proper notice, no tribe indicates A.B. is an Indian child within the meaning of the ICWA, then the juvenile court shall reinstate the order terminating parental rights.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

SUZUKAWA, J.

We concur:


EPSTEIN, P. J.


WILLHITE, J.