Filed 2/28/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re MIA M. et al., Persons Coming Under the Juvenile Court Law. | B313574 (Los Angeles County Super. Ct. No. 18CCJP07738F-H) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>A.M. et al.,<br><br>Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Nichelle L. Blackwell, TemporaryJudge. Affirmed in part, reversed in part and remanded with directions.

Jesse McGowan, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, Brian Mahler, Deputy County Counsel for Plaintiff and Respondent.

---

Seeking a new jurisdiction and disposition hearing, appellant A.M. (father) filed a petition under Welfare and Institutions Code section 388, asserting under *Ansley v. Superior Court* (1986) 185 Cal.App.3d 477 (*Ansley*) that inadequate search efforts by respondent the Los Angeles County Department of Children and Family Services (the Department) violated his due process right to notice of critical juvenile court proceedings.[1]  He now appeals the juvenile court's orders denying his section 388 petition and terminating parental rights to Mia M. (Mia) under section 366.26.  Father contends the Department did not exercise reasonable diligence, and the juvenile court's decision to deny his section 388 petition was prejudicial error.  Father further contends the court erred in failing to find he was Mia's biological father.  K.V. (mother) also appeals, and she joins in father's

---

[1] Further section references are to the Welfare and Institutions Code, unless specified otherwise.  Section 388 provides that a parent of a dependent child may petition the court for a hearing to change, modify, or set aside any previous order on the grounds of change of circumstance or new evidence. (§ 388, subd. (a)(1).)  *Ansley, supra,* 185 Cal.App.3d 477 authorized a party to a dependency proceeding to use section 388 to seek relief for a due process notice violation.

arguments.[2] The Department contends it exercised reasonable due diligence in its efforts to locate father, and that any notice error was harmless. The Department also contends that vacating all prior orders and conducting new jurisdiction and disposition hearings, as father requested in his section 388 petition, would not be in Mia's best interests.

Finding prejudicial error, we reverse the court's order denying father's section 388 petition and vacate the order terminating parental rights as to Mia. While our decision necessarily affects the order terminating mother's parental rights as well, we remand for a new jurisdiction and disposition hearing as to father only.

## FACTUAL AND PROCEDURAL BACKGROUND

### *Dependency Petition and Detention of Mother's Children*

In November 2019, the Department filed a petition alleging that mother's four children were dependents under section 300, subdivisions (a), (b), and (g). Mother's oldest child N.G. was 10 years old; Mia was 8 years old; and the youngest two children

---

[2] Mother's joinder brief does not raise any separate contentions of error regarding the denial of her section 388 petition or the order terminating parental rights for two of her other children, R.V. and S.V. Mother has accordingly waived any challenge to those orders. (*In re J.F.* (2019) 39 Cal.App.5th 70, 75–79 [even liberally construing a notice of appeal will not permit an appellate court to consider orders when an appellant has failed to provide any argument or legal authority].)

(R.V. and S.V.) were below the age of three.  According to the petition allegations, mother had failed to make an appropriate plan for the children's care, leaving them with maternal grandmother while mother's whereabouts were unknown. Mother also had histories of substance abuse and domestic violence with a male companion.  The petition identified the father of each child, but did not include allegations against any of the fathers.[3]

At the November 19, 2019 detention hearing, the court found father to be Mia's alleged father, ordered Mia and the younger children detained, and ordered the Department to present in its jurisdiction and disposition report evidence of due diligence in attempting to locate mother, father, and E.B. (the father of mother's youngest two children).

### Department's Efforts to Locate Father

A. <u>Available Information About Father's Whereabouts</u>

The Department's November 2019 detention report stated that maternal grandmother gave father's name to the social worker.  Maternal grandmother also explained that a different person, K.M.-H., "is the one who registered [Mia] as his but in reality [A.M.] is the father."  Maternal grandmother stated that father "lives somewhere in Oklahoma as child Mia goes to

---

[3] Father is only Mia's father.  N.G.'s father took custody of N.G. and is not a party to this appeal.  The youngest children (R.V. and S.V.) share a common father (E.B.), who is also not a party to the current appeal.

4

Oklahoma every summer to spend time with him and [paternal grandmother Rosa]. [Maternal grandmother] stated that she used to have contact information for them via Facebook but reported that [Rosa] recently deleted her account, therefore she no longer has contact with them or know [sic] of any other identifying information."[4]

The social worker interviewed Mia, who also explained that her last name matches K.M.-H.'s last name because K.M.-H. "has her listed as his daughter," but that her last name is supposed match father's name, because father is her "real dad." When the social worker asked Mia if she knew father's phone number or address, Mia "stated that she does not know besides he lives in Oklahoma and she visits him in the summer time as her grandmother [Rosa] buys her the ticket and she visits them." When asked how she knew all this information, Mia explained that she hears her maternal grandmother and mother talking.

Referring to father, the court noted at the November 19, 2019 detention hearing, "Apparently he resides in Oklahoma and Mia visits with him in the summers." On November 21, 2019, mother told the social worker over the phone that father is Mia's father, and that Mia's adoptive father K.M.-H. was deported to El Salvador and killed. Nonetheless, the Department included as part of its jurisdiction and disposition report a due diligence search declaration for K.M.-H., but not for father. Based on father's minimal contact with Mia, the Department recommended

---

[4] Paternal grandmother is identified with two different last names in different parts of the record. To avoid confusion, we will refer to paternal grandmother as Rosa.

5

no family reunification services and no visits with Mia for father, until such time as father contacts the Department.

Mother's first appearance in court was on December 13, 2019. She identified father as Mia's biological father, but when asked whether he openly acknowledged Mia as his daughter, mother responded that he knew he was Mia's father, but he walked away and never stepped up. K.M.-H., the individual listed on Mia's birth certificate was not Mia's biological father. The court again found A.M. to be an alleged father, and again directed the Department to conduct a due diligence search for him.

## B. Department's Search Efforts

On January 3, 2020, the Department filed a last minute information report and a declaration of due diligence summarizing the Department's efforts to locate father as of mid-December 2019. Unlike the declaration of due diligence submitted earlier for K.M.-H., the declaration of due diligence for father did not include copies of any actual searches or results. The Department interviewed mother and Mia about father's whereabouts in November 2019. Mother stated father moved to Oklahoma several years earlier, and mother had not heard from him since. Mia said she had not seen father for a long time and he lives in Oklahoma. There is no indication in the Department's due diligence report, or in any of its reports, that the Department asked mother or Mia if they had been in contact with Rosa, or knew any other paternal relatives or anyone else who might have father's contact information. Other than maternal grandmother's statements included in

the detention report and one unfruitful conversation with a paternal great aunt of Mia's half-sister N.G., there is no evidence that the Department spoke to anyone other than mother and Mia as part of an effort to locate father before the jurisdiction and disposition hearing.

According to the due diligence declaration, Department employees used father's name and date of birth to search several California and federal databases on November 25, 2019, but no matches were returned.[5]  A similar search of the Thomson Reuters CLEAR database also returned no results. The due diligence report did not include searches of any Oklahoma-specific databases.  Based on an internet search of "telephone directory clearance," the Department sent copies of the petition to seven addresses in Southern California and two addresses in Oklahoma.[6]  The Department reported that its due diligence search for father was incomplete, as the Department was still waiting for certified mail return receipts.

---

[5] The Department's due diligence efforts in 2019 used father's name and date of birth as stated on the Department's section 300 petition.  The source of this information is not apparent from the record.  The information father subsequently gave the Department in October 2020 was different, in that father gave a different spelling for his first name, and provided a middle name and a different date of birth.

[6] The two Oklahoma addresses identified in the 2019 declaration of due diligence did not correspond to father's actual address.

### *Jurisdiction and Disposition Hearing*

At the January 9, 2020 combined jurisdiction and disposition hearing, the court found notice of the proceedings had been given in accordance with the law. It noted father's whereabouts were unknown, that the Department had conducted a due diligence search for him, and that he was only an alleged father. Contact with Mia would not be permitted until father contacted the Department. The court declared Mia, and also her half-siblings R.V. and S.V., dependent children under section 300, subdivisions (b) and (g), and removed all three children from mother's custody. The court granted mother reunification services, but denied services to father, under section 361.5, subdivisions (a) and (b)(1), because he was an alleged father whose whereabouts were unknown.

### *Six-Month Review Report*

In a March 2020 phone conversation, mother told the social worker that father was in Oklahoma, but that mother didn't understand why the Department would want father's contact number because he was "not in the picture." When the social worker explained that the father had the right to know of the open dependency case, mother agreed to call father and inform him of the case. The Department noted this conversation in its July 2020 review report, along with a comment that, on other occasions, mother had stated she did not know father's whereabouts. The report also related a conversation with N.G.'s paternal great aunt, who stated she

8

knew that father had moved to another state and did not have a relationship with Mia. The July 2020 report indicated that the Department would be submitting a due diligence report for father at the next hearing; however, no subsequent due diligence report appears in the record.

### *Initial Contact with Father and Rosa*

In a last minute information filed with the court on October 15, 2020, the Department reported that the social worker spoke by phone with father, Rosa, and paternal aunt J.A. in early October 2020. The Department's report did not explain how father or paternal relatives initially obtained the social worker's contact information, or alternatively how the social worker located father.[7]

Both father and Rosa told the social worker they had been in contact with mother, but mother had not informed them of Mia's involvement in the dependency case. Rosa stated that whenever she asked mother about Mia, mother would say Mia was outside playing. It was not until Rosa insisted on getting more information about the child, in a conversation on October 1, 2020, that mother told Rosa that Mia was in foster care. Rosa was devastated to learn that Mia was in foster care when the child had paternal relatives who love her. Father asked for Rosa to be considered for possible

---

[7] Based on a delivered service log included in the appellate record, we gather that Rosa and J.A. contacted the social worker. It appears Rosa or J.A. likely provided father's contact information to the social worker, who likely called father.

placement.  Father was currently on probation but felt Mia would be well off with Rosa, near her biological family.  Rosa explained that she has always looked after Mia and considers her a daughter.  She raised Mia from two months to two years old, until mother wanted the child back.  Rosa maintained contact with mother so Mia could visit and spend several months at a time in Oklahoma with her.  Rosa had a three-bedroom home, with a bedroom Mia used when she visited Oklahoma.  Rosa requested phone communication and visits, and stated she and her husband were available for placement and wanted to be considered for placement of Mia and her younger half-siblings.  The Department recommended that a request be made under the Interstate Compact on the Placement of Children (ICPC) for Rosa.

J.A. also contacted the social worker, offering to be considered as an alternative placement if the Department would not consider placing Mia with Rosa.  According to J.A., Rosa had a DNA test administered for father when Mia was an infant, to confirm that father was Mia's biological parent.  J.A. substantiated that Rosa had always looked after Mia and considers Mia a daughter.

Father provided the social worker his address in Oklahoma, his full name, and his correct birthdate.  The social worker informed father of the upcoming six-month review hearing date and stated she would forward his information to the court.  Father said he would participate by videoconference.  The record shows that notice of the October 27, 2020 hearing was mailed to father the day he spoke with the social worker, October 2, 2020.

### *Six-Month Review Hearing*

Father did not appear at the October 27, 2020 six-month review hearing. The court discussed the Department's October 15, 2020 last minute information summarizing the recent contacts with Mia's paternal family. The court pointed out the ambiguity in the record as to whether the social workers found father or he contacted them. The court also posited that perhaps mother reached out to father in a last-ditch effort to save the children from permanency. The court emphasized that it had already declared father an "alleged" father, that his name was not on Mia's birth certificate, and that he had never come to court, "despite the due diligence the Department has provided and submitted when we did the adjudication/disposition." Neither the court nor any party raised the possibility of continuing the hearing to permit the Department to investigate the reason for father's non-appearance.

The court stated it was aware that Rosa helped raise Mia between the ages of two months and two years, but also noted that Mia was now nine years old. Acknowledging that Mia used to visit Rosa in Oklahoma, the court nonetheless concluded that neither father nor Rosa had any custodial rights. The court denied the Department's recommendation for an ICPC for Rosa, emphasizing that father was an alleged father only and he had not yet appeared in court. K.M.-H., not father, appeared on Mia's birth certificate, and father had neither allowed Mia to live with him or held her out as his child. Because father had no custodial rights to Mia, paternal

11

grandmother Rosa also had no rights to care, custody, or control of the child.

The court found mother's compliance with reunification services had been minimal; it terminated mother's reunification services and scheduled a section 366.26 hearing.

### *Initial Section 366.26 Report and Hearing*

In a section 366.26 report filed February 2021, the social worker did not specify when she spoke to father, but relayed that father was provided with notice of the upcoming February 23, 2021 hearing. Father had acknowledged he was Mia's biological father, he was aware of the hearing, he had called the number provided and was assigned an attorney, and he was ready to establish paternity. According to father, Rosa had previously verified father's paternity through a DNA test. Father provided a copy of the DNA test to the social worker, and a copy was to be attached to the report. However, the report that appears in our appellate record does not include a copy of father's DNA test as an attachment.

The Department also reported that mother "has stated she does not understand why the Department wants the fathers' or relatives' number if they are not in the picture." Mother alternately claimed she did not know their whereabouts or would reach out to them to provide the social worker's contact information. The report concludes, "[i]t is clear that mother continues to be dishonest as to the fathers."

Father appeared by videoconference at the February 23, 2021 hearing, and an attorney made a special appearance on his behalf. The court continued the section 366.26 hearing to

June 2021 for the Department to provide notice by publication to K.M.-H., the person identified on Mia's birth certificate.[8]

### *Review Hearings and Section 388 Petitions*

In April 2021, Rosa filed a pro per section 388 petition, seeking to have Mia placed with her. Rosa alleged she had cared for Mia off and on since Mia was two months old. After learning in October 2020 that Mia was in foster care, Rosa re-established communication with Mia. Rosa only learned in March 2021 that she could file a section 388 petition to seek custody. Attached to the petition were (a) Rosa's explanation for why she was now filing a section 388 petition; (b) a document notarized in August 2012, in which mother stated she was appointing Rosa as Mia's legal guardian for an eighteen-year period, from 2012 to 2029, with authority to enroll Mia in school, sign documents on her behalf (e.g., government, medical, school), and travel inside and outside of the United States; (c) a copy of Mia's birth certificate, (d) DNA test results from October 2011 stating father could not be excluded as Mia's biological father; and (e) copies of various other documents, including Mia's social security card, her immunization record, and records showing Mia received medical care and benefits in Oklahoma.

---

[8] A subsequent supplemental report filed before the continued section 366.26 hearing in June 2021 stated that K.M.-H. was noticed by publication in April and May 2021. Presumably, the Department and the court did not credit mother's earlier statement that K.M.-H had been deported to El Salvador and killed.

On April 14, 2021, over the Department's objection, the court scheduled a hearing on Rosa's section 388 petition for May 18, 2021. The court also ordered monitored visits for Rosa, with the Department having the authority to admonish Rosa not to tell Mia she is coming to live with Rosa, and authority to terminate the visit if Rosa continued making such statements. The court ordered the Department to file a report addressing Rosa's petition, an update on visitation, as well as a recommendation regarding an ICPC for Rosa.

At an April 27, 2021 post-permanency planning review hearing under section 366.3, a different attorney made a special appearance for father. The court noted that the attorney specially appearing for father had not been appointed, and unless she was going to request a DNA test, there was nothing the attorney could do.

On May 14, 2021, father's counsel filed California Judicial Council form JV-505, "Statement Regarding Parentage" (JV-505) asking the court to appoint counsel and enter a judgment of parentage. Father's counsel also filed a section 388 petition, arguing the Department's inadequate efforts to locate father and give him notice of the dependency proceeding violated father's right to due process. Father's petition noted that father was non-offending, and the reason for denying reunification services at the original January 9, 2020 disposition hearing was that father's whereabouts were unknown (§ 361.5, subd. (b)(1)). Father sought an order vacating the January 9, 2020 jurisdiction and disposition orders and resetting a jurisdictional hearing. Father's petition cited *Ansley, supra*, 185 Cal.App.3d at page 490 and argued

14

that lack of due process was a jurisdictional defect, so the best interest of the minor was not a consideration.

On the date of the next hearing, May 18, 2021, the Department reported that despite earlier problems with Rosa telling Mia she was going to Oklahoma, an in-person visit with Rosa in April 2021 had gone well. Mia's caregivers were willing to maintain ties with Mia's biological family, as long as communication was appropriate and beneficial to Mia's well-being. Rosa wanted Mia to live with her in Oklahoma, but Mia wanted to stay in her current home. At the hearing, the court appointed counsel for father. The court heard argument on Rosa's section 388 petition from Rosa herself, as well as counsel for father, the Department, and minor's counsel. In response to the court's questioning, Rosa explained that Mia stayed with Rosa from May through September 2019, just months before the petition in this case was filed in November 2019. Rosa and father's counsel argued the court should grant Rosa's section 388 petition, so Mia could be with family. The Department and minor's counsel emphasized that Mia had found stability with her foster family and that denying Rosa's section 388 petition would be in Mia's best interests. Mia's counsel also mentioned that Mia would like to have visits with Rosa, even flying out to Oklahoma, but that she wanted to be adopted by her foster family. The court denied Rosa's section 388 petition. The court acknowledged there had been a change in circumstances justifying the filing of the 388 petition, given that Rosa was previously unaware Mia was in the dependency system "because the mother was not being honest with [Rosa]." However, the court found that the requested relief was not in Mia's best interests because Mia

15

was in a safe, stable placement with her younger half-siblings, and the caregivers sought to adopt all three children. As a central part of its rationale, the court emphasized that it lacked sufficient evidence that father was even Mia's real father, as the DNA test proffered by Rosa was not authenticated, father had not come forward to ask for a DNA test in California, and a different man's name (K.M.-H.) appeared on Mia's birth certificate. The court reasoned that because father was only an alleged father, Rosa's status could be no greater than father's, and neither one had custodial rights to Mia.

The juvenile court next turned to father's section 388 petition, stating the court was aware father's petition was based on *Ansley*. The court would grant a hearing "but the court itself went through great pains with the Department and them conducting due diligences on him in trying to locate him. [¶] And so while I'm granting this particular hearing, I'm not hopeful that the hearing [sic] will actually be granted on its merits because the Department has gone through the thorough assessment and analysis and due diligence in trying to find him. [¶] And, again, the father would also have to meet that second prong of best interest, just like I imposed on the grandmother. That is the law. That is the requirement." The court scheduled the hearing on father's section 388 petition for June 22, 2021, the same day as the section 366.26 hearing, and directed the Department to file a response in advance.

The court asked father about his address and possible Indian heritage, and advised father of his obligation to meet with a financial evaluator to confirm he was entitled to

16

appointed counsel. After the court noted it had already found father to be an alleged father, and it did not have a request for a DNA test, father's counsel said she would refile the request. Father himself interjected to express that he was willing to take another DNA test, and was willing to do whatever was necessary to have Mia in Oklahoma. Father noted paternal grandmother helped him out because he was pretty young and, referring to Mia, said "We love her here. We would love to have her over here." The same day, the court signed a DNA testing order. The court's minute order stated that father's request for a DNA test to determine paternity was granted and the results were to be filed on or before June 15, 2021.

In early June 2021, mother filed a section 388 petition, seeking to take the section 366.26 hearing off calendar and to have reunification services reinstated. The court scheduled mother's section 388 petition to be heard the same day as the section 366.26 hearing.

In an interim review report filed June 14, 2021, the Department reported that samples had been collected for father's DNA test, and results were still pending as of June 11, 2021. The report contained the following summary of the Department's search efforts: "During the life of the case [Department] staff has asked mother, child Mia, paternal family members, [N.G's father], and searched public media regarding father's whereabouts." Echoing and adding new details to prior statements made in the Department's six-month review report and its section 366.26 report, the social worker explained that during the few in-person or phone conversations with mother, the social worker asked mother "multiple times about father's whereabouts and other relative

17

members." In contrast to the absence of such detail in the Department's earlier reports, the June 14, 2021 interim review report stated that mother had been asked for phone numbers of any paternal family members, and mother responded she did not have them and they might be stored on older phones. The June 14, 2021 report also echoed earlier statements that mother did not understand why the Department wanted the information because paternal family was not in the picture. The social worker explained that the two missing fathers needed to know the children were dependents, and mother would go back and forth, sometimes stating she did not know their whereabouts and other times stating she would reach out to them and provide the social worker's contact information. The social worker noted, "It is clear that mother was dishonest as to not knowing of the father's whereabouts and concealed information as to the father's whereabouts." The social worker also claimed that, although the court had ordered no family reunification for father in January 2020, "the Department continued to inquire of his whereabouts with maternal family," since mother and Mia had identified him as Mia's biological father.

The Department gave the following description of the Department's first contact with father: "In the month of October 2021, [the social worker] was able to locate father [A.M.] Paternal family was able to provide [father's] information and immediately established communication with him. During the few conversations father was informed of Mia's foster care status. Father stated that he wanted his daughter sent to [Rosa] as she cared for her when she was a baby and traveled to her, but didn't indicate wanting to

reunify with Mia." The Department recommended denying father's section 388 petition.

### *Hearings on Parents' Section 388 Petitions and Termination of Parental Rights Under Section 366.26*

On June 22, 2021, the court started by considering the section 388 petitions filed by father and mother. The court denied father's section 388 petition after argument from the parties. The court's ruling included conflicting statements about whether the Department had exercised reasonable diligence in its efforts to locate father, stating that "the Department may not have conducted enough of a due diligence to find [father] . . ." but also noting (incorrectly) that mother had made statements that father had left Oklahoma, so the Department had no reason to look there. The court also found that it was not in Mia's best interests to be placed in father's care, noting that father had not shown any desire to reunify with Mia and was not personally requesting custody.

The court denied mother's section 388 petition, finding insufficient changed circumstances and that it was not in the children's best interests. It also terminated parental rights as to Mia, R.V., and S.V. under section 366.26, finding that the children were adoptable and that no statutory exception to adoption applied. Mother and father timely appealed.

## DISCUSSION

### *Standard of Review*

We review the court's ruling on the section 388 petition for abuse of discretion (*In re E.S.* (2011) 196 Cal.App.4th 1329, 1335), but consider *de novo* whether inadequate notice violated father's due process rights. (*In re J.H.* (2007) 158 Cal.App.4th 174, 183). An error in attempted notice is subject to a harmless beyond a reasonable doubt standard of prejudice. (*In re Marcos G.* (2010) 182 Cal.App.4th 369, 387 (*Marcos G.*); *In re J.H., supra,* 158 Cal.App.4th at p. 183.)[9]

### *Father's Paternity Status*

Father's opening brief begins with a contention that the juvenile court erroneously failed to recognize father as a biological father. "'Dependency law recognizes three types of fathers: presumed, alleged and biological.' [Citation.] A biological father is one whose paternity of the child has been established, but who has not established that he qualifies as the child's presumed father under Family Code section 7611.

---

[9] In his opening brief, father argues that a constitutional due process violation should be considered structural error, but alternatively argues the court's error is not harmless beyond a reasonable doubt. The question of whether a due process violation is structural error in the dependency context is currently under review in the California Supreme Court. (See *In re Christopher L.* (Cal. 2021) 275 Cal.Rptr.3d 231, reviewing *In re Christopher L.* (2020) 56 Cal.App.5th 1172, 1188.)

[Citation.] 'A man who may be the father of a child, but whose biological paternity has not been established, or, in the alternative, has not achieved presumed father status, is an "alleged" father.'" (*In re Kobe A.* (2007) 146 Cal.App.4th 1113, 1120 (*Kobe A.*).) "A father's status is significant in dependency cases because it determines the extent to which the father may participate in the proceedings and the rights to which he is entitled. [Citation.] 'Presumed father status ranks highest.' [Citation.] Presumed father status entitles the father to appointed counsel, custody (absent a finding of detriment), and a reunification plan." (*In re T.R.* (2005) 132 Cal.App.4th 1202, 1209.) "Due process for an alleged father requires only that he be given notice and an opportunity to appear and assert a position and attempt to change his paternity status." (*Kobe A., supra*, 146 Cal.App.4th at p. 1120.) "The court *may* provide reunification services to a biological father, if it determines that the provision of services will benefit the child. (§ 361.5, subd. (a).)" (*Ibid.*)

In the current case, the court had ordered DNA testing for father, but the results were still outstanding at the time of the June 22, 2021 hearing. Since even an alleged father is entitled to notice, we decline to consider whether the court's implicit decision to proceed with the section 366.26 hearing without waiting for the results of father's DNA test was error.

### *Father's Due Process Challenge – Applicable Law*

"A section 388 petition is the appropriate method for raising a due process challenge based on lack of notice." (*In re Daniel F.* (2021) 64 Cal.App.5th 701, 711 (*Daniel F.*); *In re Justice P.* (2004) 123 Cal.App.4th 181, 188 (*Justice P.*); *Ansley,*

21

*supra*, 185 Cal.App.3d at pp. 487–488.  "It is settled beyond dispute that if a parent proves the absence of due process notice to him in juvenile dependency proceedings a 'fatal defect' exists in the jurisdiction of the juvenile court to have entered the dependency judgment."  (*Ansley, supra,* 185 Cal.App.3d at p. 483; *In re R.A.* (2021) 61 Cal.App.5th 826, 836.)

"Although alleged fathers, as distinguished from presumed fathers, have fewer rights in dependency proceedings and are not entitled to custody, reunification services, or visitation [citation], they nonetheless possess due process rights to be given notice and an opportunity to appear, to assert a position, and to attempt to change their paternity status [citation].  When an alleged father claims that a lack of notice of the proceedings caused him to fail to achieve presumed father status prior to expiration of the reunification period, his remedy is to file a section 388 petition.  [Citation.]" (*Daniel F.*, *supra*, 64 Cal.App.5th at p. 712.)

"Notice is both a constitutional and statutory imperative.  In juvenile dependency proceedings, due process requires parents be given notice that is reasonably calculated to advise them an action is pending and afford them an opportunity to defend."  (*In re Jasmine G.* (2005) 127 Cal.App.4th 1109, 1114.)  "'A parent's fundamental right to adequate notice and the opportunity to be heard in dependency matters involving potential deprivation of the parental interest [citation] has little if any, value unless that parent is advised of the *nature* of the hearing giving rise to that opportunity, including what will be decided therein.  Only with adequate notice can one choose to appear or not, to

22

prepare or not, and to defend, or not.' [Citation.]" (*Daniel F.*, *supra*, 64 Cal.App.5th at p. 712.)

"There is no due process violation where a child welfare services agency has exercised reasonable diligence to provide notice to a parent whose whereabouts are unknown. [Citation.] On this score, reasonable diligence 'denotes a thorough, systematic investigation and an inquiry conducted in good faith.' [Citation.] It includes searching not only 'standard avenues available to help locate a missing parent,' but "'specific ones most likely, under the unique facts known to the [Agency], to yield [a parent's] address."' [Citations.]" (*Daniel F.*, *supra*, 64 Cal.App.5th at p. 712.)

"'Social services agencies, invested with a public trust and acting as temporary custodians of dependent minors, are bound by law to make every reasonable effort in attempting to inform parents of all hearings. They must leave no stone unturned."' (*Daniel F.*, *supra*, 64 Cal.App.5th at p. 711.) "'[B]ecause the failure to give notice carries such grave consequences in the dependency court,' '[w]here [the agency] fails even to make an effort to provide [the parent] the procedural safeguard of notice, reversal is mandated.' (*In re DeJohn B.* (2000) 84 Cal.App.4th 100, 102, 107, 109–110 (*DeJohn B.*) [reversing termination of parental rights where mother was not given notice of the six-month hearing at which reunification services were terminated and section 366.26 hearing was scheduled].)" (*In re R.A., supra,* 61 Cal.App.5th at p. 836.)

***The Court Erred in Denying Father's Section 388 Petition***

A. <u>No Reasonably Diligent Search for Father</u>

The evidence before the juvenile court in this case was woefully inadequate to support a finding that the Department exercised reasonable diligence trying to find father, given the unique facts already known to the Department. Despite consistent reports from multiple sources that father and Rosa lived in Oklahoma, the Department made no documented efforts to search Oklahoma-specific databases or to search specific avenues most likely to identify father's whereabouts. Instead, beyond a "telephone directory clearance" database that yielded seven California addresses and two Oklahoma addresses, and a proprietary database that yielded no matches, the Department only searched California and federal databases, and took negligible steps to inquire with family members who might have additional information. The Department's lack of due diligence deprived father of the opportunity to appear at the jurisdictional hearing, to establish paternity and elevate his status above that of an alleged parent, and to seek custody of Mia.

In *Daniel F.*, the trial court erred in denying father's section 388 petition based on defective notice, where the agency's "due diligence efforts were limited to databases of records for California and Alameda County, even though the Agency was told by [relatives] that Father resided in Mexico." (*Daniel F., supra,* 64 Cal.App.5th at p. 713.) Similarly, in *In re D.R.* (2019) 39 Cal.App.5th 583, the court found service by

publication was invalid because the child welfare services agency had not exercised due diligence in its attempts to locate father. The agency "searched almost two dozen United States government databases, well aware Father had been deported to Mexico," but ignored the "most likely means of being able to actually identify Father and gain his contact information to notify him," such as asking for help from his children who were in contact with him through social media. (*In re D.R., supra*, 39 Cal.App.5th at pp. 591–592.)

Here too, the Department failed to investigate the most likely avenues for locating father. According to the Department's November 2019 detention report, maternal grandmother told the social worker that Mia goes to Oklahoma every summer to spend time with father and Rosa, but she no longer had any identifying or contact information for father or Rosa, because Rosa had recently deleted her Facebook account. After that, there is no evidence that any social worker asked maternal grandmother if she had any additional information that might help locate father or Rosa, such as common friends, or more specific location information, or travel records from Mia's trips to see Rosa. We find nothing in the record to show that the Department even asked when maternal grandmother was last in contact with Rosa or father, or when Mia last visited Oklahoma (which, as it turns out, was quite recently for a several month period).

Instead, the Department's only documented search efforts were interviewing mother and Mia—both of whom stated in November 2019 that father lives in Oklahoma—and running searches on standard California and federal databases, plus a telephone directory clearance database that

produced two incorrect Oklahoma addresses.  Despite the Department itself stating in a January 3, 2020 last minute information that its due diligence search for father was incomplete, the juvenile court found notice proper as to all parties at the January 9, 2020 jurisdiction and disposition hearing.  Moreover, citing the admittedly incomplete search, the court ordered that father could not have contact with Mia without first contacting the Department.  Despite its own admission of an incomplete search, the Department did not take the initiative to make any additional, documented efforts to search for father except for cursory discussions with mother, who displayed reluctance to permit father's participation in the proceedings, and half-sister N.G.'s paternal great aunt, an unlikely source of helpful information.  It was not until Rosa contacted the Department in October 2020, some eleven months after the incomplete due diligence efforts, that she and father were made aware of the proceedings.  As a consequence of these shortcomings, the Department and the court appear to have turned the search and notice requirements upside down, with the Department recommending, and the court ordering, that father could not contact Mia without first contacting the Department.

The juvenile court's own statements at the June 22, 2021 hearing about whether the Department had exercised reasonable diligence were somewhat equivocal.  To the extent the decision to deny father's section 388 petition was based on a finding of reasonable diligence, it is unsupported by the record evidence.

B. Improper Consideration of Mia's Best Interests

The Department contends, and the juvenile court found, the relief father was seeking under section 388 was not in Mia's best interests. We conclude that the juvenile court erred in relying on Mia's best interests as a basis for overcoming the lack of notice to father and denying father's section 388 petition.

The analysis of a section 388 petition is "different when a parent shows he did not receive notice of the dependency petition in violation of due process." (*In re R.A.*, *supra*, 61 Cal.App.5th at p. 837; see also *Ansley*, *supra*, 185 Cal.App.3d at pp. 490–491 [it is always in minor's best interests to have dependency adjudication based on participation of all interested parties entitled to notice].) In *Daniel F.*, the juvenile court denied father's section 388 petition without an evidentiary hearing, reasoning that the agency could not be faulted for its failure to find father, who had minimal contact with the minor, and there was insufficient evidence that holding a hearing or granting father relief would be in the minor's best interest. (*Daniel F., supra*, 64 Cal.App.5th at p. 710.) The appellate court reversed, not only because the agency's efforts to find father were inadequate (*id*. at pp. 711–714), but also because the juvenile court erroneously considered minor's best interests (*id*. at pp. 715–716). Addressing the agency's argument that the father was only an alleged father who had not yet established paternity, the appellate court explained, "[f]ather was deprived of notice of critical proceedings during which he could have established paternity and asserted parental rights. Though we are keenly

27

mindful of [minor's] interests in having a stable placement as soon as possible, a 'best interests' showing was not required under the circumstances. ([*In re*] *R.A.*, *supra*, 61 Cal.App.5th at pp. 836–838; *Ansley*, *supra*, 185 Cal.App.3d at pp. 490–491.)" (*Daniel F., supra*, 64 Cal.App.5th at p. 716.)

The appellate court in *In re R.A.* similarly concluded that the best interest prong of section 388 does not apply "when a parent shows he did not receive notice of the dependency petition in violation of due process." (*In re R.A., supra,* 61 Cal.App.5th at p. 836.) In that case, the parties and the juvenile court agreed that defective notice satisfied the "changed circumstances" prong of father's section 388 petition, but the trial court denied the petition, because setting aside all prior findings and orders was not in the child's best interests. (*Id.* at p. 835.) The appellate court reversed, relying on the reasoning in *Ansley*, *supra*, 185 Cal.App.3d at page 490–401 that "it is implicit in the juvenile dependency statutes that it is always in the best interests of a minor to have a dependency adjudication based upon all material facts and circumstances and the participation of all interested parties entitled to notice." (*Ansley, supra,* 185 Cal.App.3d at pp. 490–491; *In re R.A., supra,* 61 Cal.App.5th at pp. 836–837 ["no *additional* showing of best interest to the child is necessary].)

In the current appeal, the Department argues the juvenile court correctly applied *Justice P., supra*, 123 Cal.App.4th at page 190, when it considered Mia's best interests as a basis for denying father's section 388 petition. The *Justice P.* court distinguished *Ansley* on its facts and procedural posture, pointed out that the dependency statutory scheme was different when *Ansley* was decided in 1987, and commented that "*Ansley* is a lofty expression of how the dependency system would work under

28

ideal circumstances, but does not reflect the all too often harsh reality of how these cases proceed." (*Justice P., supra*, 123 Cal.App.4th at p. 191.) Rejecting the argument that any section 388 petition alleging a prima facie notice violation necessarily meets the "best interests" showing, *Justice P.* reasoned that where reasonable efforts have been made, but a missing parent later surfaces, "it does not automatically follow that the best interests of the child will be promoted by going back to square one and relitigating the case." (*Id.* at p. 191.)

We find *Daniel F.* and *In re R.A.* to be more applicable and persuasive than *Justice P.* in the circumstances present here, where an agency's search efforts are unreasonably lacking, and the failure to notify a parent leads to a prejudicial delay in participation. The *Justice P.* court reasoned that removing discretion to deny a section 388 hearing based on best interests "would be antithetical to not only the section 388 process but also to the current dependency system as a whole." (*Justice P., supra*, 123 Cal.App.4th at p. 190.) Such an approach ignores the key role of the child services agency entrusted with searching for a child's parents. "We cannot accept the idea that an agency may completely ignore its duty to search for a missing parent and then, should the missing parent show up, rely on the best interest of the child to preclude that parent from participating in the dependency case." (*In re R.A., supra*, 61 Cal.App.5th at p. 839.) Allowing a child's best interests to act as a counterbalance to the agency's due diligence obligations would turn one of the key goals of the dependency statutory scheme on its head, reducing the chance of family reunification while simultaneously rewarding inadequate efforts to notify parents. We therefore conclude the

juvenile court erred by denying father's section 388 petition based on Mia's best interests.

C. Passage of Time Before Father's Section 388 Petition

The Department also argues that father's own delay in seeking section 388 relief exacerbated the impact on Mia's best interests, as Mia had been living with her foster family for 18 months at the time of father's section 388 hearing. We disagree, primarily because the record does not support the Department's implied argument that father was to blame for the delay. "In determining whether the petition makes the necessary showing, the court may consider the entire factual and procedural history of the case." (*Justice P.*, *supra*, 123 Cal.App.4th at p. 189.)

The Department correctly observes that father did not appear at the very first opportunity after he learned of the dependency proceedings, the October 27, 2020 six-month review hearing. However, that hearing took place just a little over three weeks after father's first phone call with the Department. The record does not include any evidence showing whether or when the social worker provided father with information about how to request appointment of an attorney, or any of the other information usually provided to a parent before an initial dependency hearing. (*In re Daniel F., supra,* 64 Cal.App.5th at p. 714 [agency's "failure to provide Father with the statutorily required materials denied him adequate notice of his rights and the ability to access procedures for establishing paternity and obtaining reunification services"].) At the time of the October 27, 2020 hearing, the Department's recommendation was to request an ICPC for possible placement with Rosa, which was in

accordance with the wishes father had expressed in his discussion with the social worker when he was told about the hearing. Instead of continuing the hearing to permit the Department to inquire into the reason for father's non-appearance, and without any evidence or the benefit of a completed JV-505 form from father, the court proclaimed that neither father nor Rosa had any custodial rights over Mia, and that the ICPC request was not in Mia's best interests. Since the Department was recommending the ICPC, and father was not fully advised of what additional issues might be addressed at the hearing, or how to protect his interests, father's non-appearance did not remedy or excuse the Department's failures. (*Daniel F., supra,* 64 Cal.App.5th at p. 712 [the right to adequate notice has little if any value where a parent is not advised of the nature of the proceeding and what will be decided; adequate notice is essential for a parent to choose to appear or not].)

The next report filed by the Department after the October 2020 six-month review hearing was the February 2021 section 366.26 report, which stated that father had acknowledged he was Mia's biological father, he was aware of the upcoming section 366.26 hearing, he had called the number provided and was assigned an attorney, and he was ready to establish paternity. The report gave no information about the time frame of these events, nor did it specify when father had been interviewed. Father was present at the February 2021 hearing, and his attorney made a special appearance, but because notice was not proper, the hearing was continued to June 2021. While it might be argued that father's attorney could have acted more promptly in filing the section 388 motion alleging a due process violation, we are not inclined to speculate, based on the limited record

31

before us, about the reasons for the delay, nor are we prepared to blame the delay on father.

*Prejudicial Error*

The Department contends father's lack of involvement since he learned of the proceedings in October 2020 shows that any notice error was harmless. However, considered against the absence of any documentary evidence showing that the Department timely provided father a copy of the petition or required notices about how to assert paternity and request appointment of counsel, we find prejudicial error.

After father first spoke with the social worker on October 2, 2020, the Department's last minute information simply stated that father was informed of the future hearing date (presumably the upcoming six-month hearing), that the social worker would forward the information to court, and father stated he would be calling WebEx the day of the hearing. On the same day, the Department mailed father notice of the upcoming six-month review hearing. We do not, however, find in the record any proof of service showing when (or whether) the petition or the JV-505 was mailed to father. Father's failure to attend the six-month hearing on October 27, 2020, when the court denied the Department's recommendation to request an ICPC for Rosa, is not enough to support a finding that the violation of his due process rights was harmless beyond a reasonable doubt. (*In re J.H., supra*, 158 Cal.App.4th at p 183 [harmless beyond a reasonable doubt standard of prejudice].)

The court denied the Department's October 15, 2020 recommendation for an ICPC to pave the way for placement with Rosa on the ground that father was only an alleged father and had not yet appeared in court to assert paternity. However, if the Department had properly noticed father at the outset of the dependency proceeding, it is reasonably likely that the court would have viewed the recommendation for an ICPC and consideration of placement with Rosa differently. Indeed, the Legislature has articulated a clear preference for relative placement in dependency cases. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 320 [Legislature's intent is to command that relatives be assessed and *considered* favorably, subject to the juvenile court's determination]; Fam. Code, § 7950 [placement shall, if possible, be made in the home of a relative, unless the placement would not be in the best interest of the child]; see also *In re Isabella G.* (2016) 246 Cal.App.4th 708, 722–723.) As father points out, placement and possibly legal guardianship with Rosa would be a more favorable outcome for father.

Later events also reinforce our finding of prejudicial error. By February 2021, father had reported he had been assigned an attorney and was ready to establish paternity. Father's counsel made special appearances on his behalf in February and April 2021, and father was present at both hearings. In May 2021, father's attorney filed the JV-505 statement of parentage, seeking a parentage judgment. Father's JV-505 stated he openly acknowledged Mia to be his child and spent vacations with her. By the June 2021 hearing, father had already sought recognition as Mia's biological father; if granted that status, he could ask the court to

exercise its discretion to order reunification services. "The court *may* provide reunification services to a biological father, if it determines that the provision of services will benefit the child. (§ 361.5, subd. (a).)" (*Kobe A.*, *supra*, 146 Cal.App.4th at p. 1120.) On this record, we decline the Department's invitation to assume that father would not have appeared at earlier hearings had the Department promptly discharged its duties to provide him with proper notice.

We find the court's denial of father's section 388 petition was prejudicial error. We also vacate the court's order terminating parental rights under section 366.26. (*In re Al.J.* (2019) 44 Cal.App.5th 652, 675.) We acknowledge that our decision today will further delay permanency for Mia. We emphasize that nothing in our opinion should be construed as preventing the court from considering facts and circumstances that have arisen since the filing of this appeal when it conducts a new jurisdiction and disposition hearing as to father. (*In re Alexandria P.* (2014) 228 Cal.App.4th 1322, 1357 [ensuring juvenile court applies correct legal standard does not preclude the court from considering post-appeal developments].)

Although mother filed a separate appellate brief joining in father's arguments on appeal, and our decision has the effect of restoring mother's parental rights, we emphasize that the court's October 27, 2020 order terminating mother's reunification services and the June 22, 2021 order denying mother's section 388 petition remain unchallenged. In other words, nothing in our decision requires the juvenile court to revisit its prior decisions concerning mother.

34

## DISPOSITION

The juvenile court's order denying father's section 388 petition is reversed, the order terminating parental rights is vacated as to Mia M. only, and the matter is remanded for the court to conduct a new jurisdiction and disposition hearing on issues involving father only.  In all other respects, the juvenile court's orders are affirmed.


MOOR, J.


We concur:


RUBIN, P. J.


KIM, J.