Filed 6/6/24  In re A.C. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.C., et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E082520 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J290945-47 & J294367) |
| v. | OPINION |
| NICK C., et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Steven A. Mapes, Judge.  Affirmed.

Jack A. Love, under appointment by the Court of Appeal, for Appellant Father, Nick C.

Suzanne M. Davidson, under appointment by the Court of Appeal, for Appellant Father, Jonathan A.

1

Jill S. Smith, under appointment by the Court of Appeal, for Appellant, Mother.

Joseph R. Barrell, Deputy County Counsel and Tom Bunton, County Counsel for Respondent.

In this dependency proceeding, Nick C. (Nick or father) appeals from the termination of his parental rights to four minor children. In addition, Jonathan A., the biological father of the oldest child, challenges the trial court's denial of a petition he filed under section 388 of the Welfare and Institutions Code (unlabeled statutory references are to this code). C.S. (mother) joins both appeals. We affirm.

BACKGROUND

I.     *Proceedings resulting in the termination of parental rights*

The family came to the attention of San Bernardino County Children and Family Services (CFS) in October 2021. CFS received a referral alleging physical abuse of A.C., the three-week old daughter of mother and father (collectively, parents). A.C. had been admitted to the hospital and had parietal bone fractures on both sides of her skull, subdural hematomas on both sides of her head, microhemorrhages in her brain, three "'corner fractures'" on her right leg, and subconjunctival hemorrhaging in her eye. Dr. Komal Aziz performed a forensic exam of A.C. and opined that A.C.'s injuries were caused by blunt force trauma, shaking, and/or falling from a significant height. He concluded that A.C.'s injuries were most consistent with abusive head trauma and physical abuse.

In separate interviews with a social worker and a sheriff's deputy, parents initially denied causing A.C.'s injuries or knowing how the injuries were caused. Father

2

eventually told the deputy that he had accidentally dropped A.C. The deputy recorded father reenacting the scene with a doll and showed the video to Dr. Aziz. According to the doctor, A.C.'s injuries were not consistent with father's explanation.

CFS asked parents to bring to the hospital for assessment their two other children—a five-year-old son, A.A., who was born in January 2016, and a one-year -old daughter, E.C., who was born in June 2020. A.A. had no injuries. E.C.'s x-rays showed fractures to the back of her ribs. Dr. Aziz noted that the healing fractures on E.C.'s ribs were typically caused by squeezing or compression of the rib cage or direct blows. Given that parents did not provide any history to explain those findings, the doctor concluded that E.C.'s injuries were highly suspicious for physical abuse.

The court issued a protective custody warrant to detain all three children, and CFS placed them with a relative on an emergency basis. CFS filed petitions alleging that A.C. and E.C. were described by subdivisions (a), (b), (e), and (j) of section 300, while A.A. was described by subdivisions (a) and (j) of section 300.

The court held a detention hearing in October 2021. Mother reported that Nick was the biological father of A.C. and E.C. and that Jonathan was A.A.'s biological father. Parents married in December 2018, before A.C. and E.C. were born. Jonathan was not present at the hearing, but Mother reported that she was married to him when A.A. was born, so the court questioned mother to try to obtain more information about Jonathan's identity and whereabouts.

The court adopted the findings and orders recommended by CFS and detained the three children from parents. The court ordered weekly two-hour visits for mother. CFS

3

recommended and the court found that visitation with father would be detrimental in that it would be "harmful to the [children's] safety and/or emotional well-being," so the court denied father visitation.

In interviews with a social worker after the detention hearing, parents reported that no one in the home caused A.C.'s injuries. Father claimed that he never told the deputy that he lost hold of A.C.'s head and dropped her. Parents claimed that they conducted their own investigation and discovered that A.C. and E.C. suffered from a genetic condition that affected their bones. Both parents otherwise denied a family history of fragile or easily broken bones.

A.A. spoke with a forensic interviewer in November 2021 and disclosed that father hit E.C. with his hand, causing her to cry "'a lot,'" which caused mother and father to argue. A.A. also reported that father hit A.A. with his hand.

E.C. underwent genetic testing, and the geneticist found "[n]o clinically relevant alterations [were] detected." The testing revealed a single variant of "uncertain clinical significance" in a particular gene that the geneticist determined was "not expected to explain [E.C.'s] history of fractures." Dr. Aziz reviewed the results and reported that they did not change his forensic opinion. Because E.C.'s results did not identify anything, A.C. did not undergo any genetic testing.

A.C., E.C., and A.A. were placed together in a nonrelative foster home in August 2022. The children had not suffered any further injuries since they had been in CFS's care.

In late August 2022, mother gave birth to another daughter, Ei.C. On the basis of the injuries to Ei.C.'s siblings, CFS determined that Ei.C. was also at risk of physical abuse. CFS filed a petition alleging that Ei.C. was described by section 300, subdivision (j), because her siblings were physically abused while in parents' care. In September 2022, the court detained Ei.C. from parents, ordered weekly two-hour visits for mother, and denied father visitation, finding it would be detrimental to Ei.C. Ei.C. was eventually placed in the same foster home as her siblings.

At a pretrial conference in September 2022, the children's counsel asked that the court find that further visitation with mother would be detrimental. The court permitted mother to testify, found that further visitation with her would be detrimental to the children, and suspended her visitation. The court observed that although it had already found that visitation with father would be detrimental and that he was not to have any contact with the children, mother was doing things "with the kids to wrap [father] into" visits.

The contested jurisdiction and disposition hearings took place over the course of numerous days in October and November 2022 and February and March 2023. (*C.S. v. Superior Court* (May 30, 2023, E080818) [nonpub. opn.].) Dr. Aziz and a social worker testified on behalf of CFS, and parents and an orthopedic surgeon testified on behalf of parents. (*Ibid.*)

The juvenile court took jurisdiction over all four children, finding true the allegations under subdivision (j) of section 300 for all four children and also finding true the allegations under subdivisions (a), (b), and (e) of section 300 as to A.C. and E.C. The

5

court found Nick to be the presumed father of all four children.  With respect to disposition, the court declared the children dependents and removed them from parents' custody.  The court denied parents reunification services under section 361.5, subdivision (b)(5), (6), and (7), and it denied both parents visitation, finding that visitation would be harmful to the children's safety and/or emotional well-being.  The court set a section 366.26 hearing to select a permanent plan for the children.

Both parents petitioned for extraordinary writ review of the order setting the section 366.26 hearing.  Mother challenged the sufficiency of the evidence supporting the jurisdictional findings, the removal order, and the court's finding that visitation with her would be detrimental to the children.  (*C.S. v. Superior Court*, *supra*, E080818.)  Father joined mother's arguments and did not raise any additional issues.  We denied the petitions in an unpublished opinion.  (*Ibid.*)

In June 2023, CFS submitted a report prepared for the section 366.26 hearing.  All four children resided in the same home in which the three oldest children were placed in August 2022.  CFS indicated that the children were all doing well physically, emotionally, and developmentally and that the three youngest children—Ei.C., E.C., and A.C.—were all emotionally attached to their caregivers.

The court held the section 366.26 hearing in November 2023.  Both parents objected to the termination of parental rights.  Father's counsel argued that father loved the children and had a bond with them but also acknowledged that father had not visited with the children in over one year because he had been denied visitation.  The court found the children likely to be adopted and terminated parental rights.  The court found

6

that the parental bond exception did not apply because parents had not regularly visited with the children.

II.     *CFS's efforts to locate Jonathan*

At the detention hearing in October 2021, mother reported that she and Jonathan divorced in Panama, and mother said that she had paperwork from that proceeding. According to mother, no child custody, child support, or visitation orders were issued. Mother knew the month and year of Jonathan's birth but not the date. Mother did not know whether Jonathan still lived in Panama. The last mother knew, Jonathan lived in Sinaloa, Mexico, but she did not have a current address for him and did not know the name of the street in Sinaloa on which he previously resided.

After the detention hearing, mother told a social worker that she had not seen Jonathan since A.A. was six months old, which would have been sometime in 2016. Mother denied having any information about Jonathan's current whereabouts or about his family members.

In November 2021, CFS submitted a declaration of due diligence concerning its search for Jonathan. CFS reported that it did not discover any information about Jonathan, given that it did not have Jonathan's birthdate or social security number. CFS had searched the internet with an unidentified subscription service and also searched numerous local, state, and federal databases. The internet search resulted in "[t]oo many to identify."

In a subsequent report signed on December 28, 2021, CFS reported that in December 2021 a social worker "sent the 175.2 Parent locating request to the Jamaican

7

Consulate." The social worker did not receive any additional information concerning Jonathan.

The day after Ei.C.'s birth in August 2022, Mother told a social worker that she had married Jonathan in Mexico sometime before A.A. was born. Mother could not recall the date of either the marriage or the divorce. A social worker initiated a parent location request and notification with the Mexican consulate in San Bernardino, California. The social worker followed up with CFS's consulate liaison twice the next month, and the liaison relayed that there was "no new information."

At the contested jurisdiction and disposition hearing in March 2023, the court found by clear and convincing evidence that CFS engaged in reasonably diligent efforts to locate Jonathan and that those efforts had been unsuccessful. The court found Jonathan to be A.A.'s alleged father.

CFS completed a second due diligence report in May 2023 in preparation for the section 366.26 hearing. The report chronicled the recent efforts that CFS had undertaken to search for Jonathan in numerous local, state, and federal databases and on the internet. CFS reported that it was unable to locate Jonathan, given that it did not have his birthdate or a social security number. The internet search was ineffective because it netted "[t]oo many results," and CFS could not verify which results were relevant without better identifying information for Jonathan.

In July 2023, the court ordered, at CFS's request, that A.A.'s name be changed in the case management system (JNET) to match the name on his birth certificate. The court attached A.A.'s birth certificate to the order. The birth certificate lists Jonathan as

8

A.A.'s father and Panama as Jonathan's birthplace. The court also granted CFS's request to order E.C.'s name changed in JNET to match the name on her birth certificate.

In June and July 2023, CFS served Jonathan notice of the section 366.26 hearing by publication. The notice was published in a local newspaper in San Bernardino, California once weekly for one month.

A representative of the Panamanian consulate contacted the court in October 2023. The representative indicated that Jonathan lived in Panama and was interested in obtaining a court-appointed lawyer. The court appointed a lawyer for Jonathan.

III.    *Jonathan's section 388 petition*

On October 30, 2023 (two days before the scheduled section 366.26 hearing date of November 1), Jonathan filed a section 388 petition with A.A.'s birth certificate attached as an exhibit. In the petition, Jonathan's attorney incorrectly asserted that the birth certificate identifies Panama as Jonathan's place of residence.[1] The petition described Jonathan's proposed testimony concerning his marriage to mother in 2015, how long they lived together in both Mexico and Panama after A.A.'s birth, the divorce, the postdivorce contact that Jonathan had with A.A. while A.A. lived with mother in the United States, the postdivorce financial support that Jonathan provided mother for A.A., and the circumstances surrounding mother's cessation of all contact with him.

---

[1]    The copy of A.A.'s birth certificate attached to the section 388 petition is difficult to read, and the caption of the box in which "Panama" is listed is not clear. It is clear from the copy attached to the court's earlier order that the box's label reads: "BIRTHPLACE – STATE/COUNTRY."

9

Jonathan asked that the court find him to be a "presumed father, and order custody and/or reunification services with a plan of return to [Jonathan], and/or visitation." The court ordered an evidentiary hearing on the petition, at which Jonathan would be allowed to testify.

IV.     *Evidentiary hearing on section 388 petition*

Jonathan testified by telephone with an interpreter. He said that mother became pregnant when they were married and lived in Mexico. They lived there together for one and one-half years total, three months of which occurred after A.A. was born. They then moved to Panama when A.A. was three months old and lived there for another eight or nine months. Jonathan also testified that he had lived with A.A. for nine months total.

Sometime around the end of 2016 or the beginning of 2017, mother and Jonathan divorced in Panama. Jonathan could not recall whether A.A. was mentioned in the divorce decree, but A.A. was not a Panamanian citizen. The divorce decree did not mention child custody or visitation.

After the divorce, mother and A.A. moved to Phoenix, Arizona. Jonathan did not move with them, because he could not legally enter the United States. Jonathan remained at the same address in Panama and never moved back to Mexico. He maintained contact with A.A. "for a time" by video calls through WhatsApp. During those calls, Jonathan watched A.A. learn to walk, talk, and brush his teeth, and Jonathan also watched A.A. get dressed and play. A.A. called Jonathan, "'Dad.'" Jonathan provided mother with financial support.

10

Mother remarried when A.A. was almost three years old. Jonathan's calls with A.A. at first became less frequent and then stopped altogether. Jonathan last interacted with A.A. when A.A. was three or four years old. Mother changed her phone number, blocked Jonathan on social media, and moved to a new residence. Jonathan's family members attempted to contact mother, but she did not respond. Jonathan was not aware that mother had relocated to California. Jonathan unsuccessfully attempted to obtain a visa through the United States embassy in order to travel to the United States. He did not contact the Panamanian embassy, because A.A. is not a Panamanian citizen. Sometime before the pandemic in 2019 or 2020, Jonathan hired several lawyers in Panama to help him obtain Panamanian citizenship for A.A., but he ceased those efforts in 2021 because of the pandemic.

Jonathan first became aware of the dependency proceedings about one year before the hearing, when he saw interviews of mother on social media. Mother then contacted him directly about the proceedings about two to three months before the hearing. Jonathan testified that he contacted CFS two or three months after mother contacted him, but he also said that he contacted CFS immediately after mother contacted him. CFS told Jonathan to contact the court to get an attorney appointed, which he did.

11

V.    *Section 388 ruling*

After the matter was submitted and before counsel argued, the court issued a tentative ruling in which it indicated that Jonathan qualified as a presumed father. The court was not inclined to reconsider Nick's status as A.A.'s presumed father, which no party had asked the court to do. The court believed that it would be detrimental to A.A. to have two presumed fathers. The court did not believe that Jonathan met the standard of *Adoption of Kelsey S.* (1992) 1 Cal.4th 816. The court also found that Jonathan lacked credibility regarding his efforts to assert parenthood and his motives.

After counsel argued, the court adopted its tentative ruling and denied the section 388 petition, finding that Jonathan was a biological father and not a presumed father. The court found that the evidence demonstrated that from the outset of the divorce Jonathan "took no efforts to make sure he was a constant factor in [A.A.'s] life at all." The court further found that "the rest of his evidence [was] suspect and tainted by Mother's late involvement with him." The court also found that mother intentionally misled the court at the detention hearing concerning her knowledge of Jonathan's whereabouts.

DISCUSSION

I.    *Father's visitation*

Father argues that the juvenile court violated his right to due process by denying him visitation with the children, which resulted in the termination of his parental rights. The argument is not cognizable on appeal from the order terminating parental rights.

12

"All court orders, regardless of their nature, made at a hearing in which a section 366.26 permanency planning hearing is set must be challenged by a petition for extraordinary writ." (*In re Merrick V.* (2004) 122 Cal.App.4th 235, 247; *In re Tabitha W.* (2006) 143 Cal.App.4th 811, 817; § 366.26, subd. (*l*).) When a section 366.26 hearing is set at the disposition hearing, the juvenile court's dispositional orders are reviewable, "if at all, only by way of a writ petition." (*In re Athena P.* (2002) 103 Cal.App.4th 617, 625.) Failure to seek writ review of a nonappealable dispositional order "shall preclude subsequent review by appeal of the findings and orders." (§ 366.26, subd. (*l*)(2) (§ 366.26(*l*)(2)).)

Father filed a writ petition from the dispositional order setting the section 366.26 hearing. But his petition merely joined the arguments made by mother in her separately filed writ petition. Mother did not (and could not) challenge the dispositional order denying father visitation. Father did not make any arguments of his own. He thus did not challenge the dispositional order denying him visitation. Father is therefore barred by statute from challenging that order on this appeal. (*Sarah M. v. Superior Court* (2005) 36 Cal.4th 998, 1018.)

Father's arguments to the contrary have no merit. First, father argues that his late challenge to the dispositional order is not forfeited because it does not violate the principle that raising an argument for the first time on appeal is unfair to the lower court. That principle has no bearing on our analysis. The dispositive issue is that on appeal from the termination of parental rights father cannot challenge an order entered at the disposition hearing at which the section 366.26 hearing was set. (§ 366.26(*l*)(2).)

13

Second, father argues that we should exercise our discretion not to apply forfeiture because of "the importance of visitation leading into a hearing where the recommendation is to terminate parental rights." The argument fails because it conflicts with section 366.26(*l*)(2)'s prohibition of subsequent review of an order made at a hearing setting a section 366.26 hearing. Section 366.26(*l*)(2) is not discretionary.

II.      *Jonathan's contentions*

Jonathan does not challenge the juvenile court's finding that he is A.A.'s biological father and not a presumed father. Jonathan instead argues that his due process rights were violated because CFS failed to exercise reasonable diligence in attempting to locate him and notify him of the proceedings. In particular, Jonathan argues that CFS was insufficiently diligent because it did not contact the Mexican and Panamanian consulates. He contends that the error was not harmless beyond a reasonable doubt and that the juvenile court should hold a new jurisdiction hearing as to A.A. We conclude that Jonathan has not shown any violation of his due process rights.

"Notice is both a constitutional and statutory imperative." (*In re Jasmine G.* (2005) 127 Cal.App.4th 1109, 1114.) "Due process requires that a parent is entitled to notice that is reasonably calculated to apprise him or her of the dependency proceedings and afford him or her an opportunity to object." (*In re Justice P.* (2004) 123 Cal.App.4th 181, 188 (*Justice P.*).) "An alleged father in dependency proceedings is entitled to notice, because notice provides him an opportunity to appear and assert a position and attempt to change his paternity status." (*In re O.S.* (2002) 102 Cal.App.4th 1402, 1408; § 316.2, subd. (b).) "The child welfare agency must act with diligence to locate a missing

14

parent." (*Justice P.*, *supra*, at p. 188.) "Reasonable diligence denotes a thorough, systematic investigation and an inquiry conducted in good faith." (*Ibid.*) If the agency has made a good-faith attempt to notify a parent whose whereabouts are unknown for the majority of the proceedings, then there is no due process violation. (*Ibid.*) "A section 388 motion is a proper vehicle to raise a due process challenge based on lack of notice." (*Id.* at p. 189.)

In order to prevail on appeal, Jonathan must set forth all of the material evidence, favorable or unfavorable, that bears on his argument. (*In re S.C.* (2006) 138 Cal.App.4th 396, 414-415.) Jonathan has failed to do that in his opening brief. In particular, he faults CFS for failing to contact the Mexican consulate, but he does not mention that CFS did contact the Mexican consulate in August 2022. (Jonathan also fails to mention that in an early addendum report CFS reported contacting the "Jamaican Consulate" in December 2021. There is no evidence that Jonathan had any ties to Jamaica, so it is possible that the report's reference to Jamaica is a typographical error and the social worker meant to say Mexico or Panama.) Thus, Jonathan fails to mention all of the evidence concerning CFS's attempts to locate him, and he instead incorrectly states that there is no evidence that CFS contacted the consulates of either Mexico or Panama. Because Jonathan does not cite all of the material evidence concerning CFS's efforts to locate him, his argument on this point is forfeited. (*Ibid.*)

In any event, Jonathan fails to demonstrate that CFS did not employ reasonable diligence in attempting to locate him. Mother provided minimal information concerning Jonathan's identity and possible whereabouts. She claimed not to know his birthdate or

15

his current whereabouts, and she claimed not to have any contact information for his relatives. She divorced Jonathan in Panama sometime in 2016 and last knew him to be living in Sinaloa, Mexico. On the basis of that limited information, CFS searched the internet and various federal, state, and local databases but obtained no useful results (Jonathan's first and last names are very common). In addition, CFS contacted the Mexican consulate in August 2022 to search for Jonathan. Given that mother reported that Mexico was the last place that she knew Jonathan to have resided, it was reasonable for CFS to conclude that Jonathan might live in Mexico.

For all of these reasons, the evidence shows that CFS made reasonable and diligent efforts to locate Jonathan. It contacted the Mexican consulate and searched appropriate databases, using the limited information available. Due process does not require that CFS's search efforts be perfect or that they be successful. (*Justice P.*, *supra*, 123 Cal.App.4th at p. 188.) Because CFS employed reasonable diligence in searching for Jonathan, his due process rights were not violated.

Jonathan's only arguments to the contrary are that (1) "[n]o evidence showed the department made any efforts to contact the Panamanian or Mexican Consulates," and (2) CFS made insufficient "efforts to review the divorce paperwork or [A.A.]'s birth certificate to obtain contact information for father's whereabouts." The first argument fails for two reasons. First, CFS did contact the Mexican consulate. Second, even after CFS learned that Jonathan was born in Panama, it was not unreasonable for CFS to fail to search for him there. Mother claimed that Jonathan's last known residence was in

16

Mexico, and CFS had no reason to believe that he might be found in Panama, even after learning that he was born there.

Jonathan's second argument fares no better. He fails to explain what information the divorce paperwork might have contained that would have aided CFS's efforts to find him. Jonathan did not attach the divorce paperwork to the section 388 petition, and it is not otherwise part of the record. And there is no evidence that CFS already had the birth certificate when it conducted its two searches for Jonathan or that CFS was insufficiently diligent in trying to obtain it sooner. Moreover, the record contains no evidence that CFS had obtained the birth certificate before July 2023, when CFS asked the court to update the case management system to correct A.A.'s name. But by then Jonathan had already been aware of the dependency proceedings for months—he testified in November 2023 that he first learned of the case "[a]bout a year" ago. Jonathan does not explain how CFS's alleged failure "to review . . . [A.A.]'s birth certificate" after Jonathan already had actual notice of the proceedings could have caused a due process violation for lack of notice.

For all of these reasons, Jonathan has not shown that CFS failed to conduct a sufficiently reasonable and diligent search to satisfy the requirements of due process. (*Justice P.*, *supra*, 123 Cal.App.4th at p. 188.)

Finally, mother argues that if the order terminating parental rights is reversed for A.A., then it must be reversed as to the other three children so that the juvenile court can consider whether the sibling bond exception applies. (§ 366.26, subd. (c)(1)(B)(v).) The

17

argument fails because we are not reversing the order terminating parental rights as to A.A.

DISPOSITION

The orders terminating parental rights are affirmed.  The order denying Jonathan's section 388 petition is also affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


MENETREZ
J.

We concur:


MCKINSTER
Acting P. J.


MILLER
J.

18